362 So.2d 1368 (1978)
Joe DIXON, Individually and as natural tutor of the minor, Judith Ann Dixon
v.
ALLSTATE INSURANCE CO.
No. 61610.
Supreme Court of Louisiana.
September 5, 1978.
Rehearing Denied October 5, 1978.
Joseph D. Cascio, Jr., Hayes, Harkey, Smith & Cascio, Monroe, for plaintiffs-applicants.
Ben R. Hanchey, Hudson, Potts & Bernstein, Monroe, for defendants-respondents.
*1369 DIXON, Justice.
Joe Dixon sued individually and as the natural tutor of his minor daughter, Judith Ann, for injuries she sustained from colliding with and penetrating a sliding glass door in the home of defendant's insured. Subsequently Judith Ann was substituted as plaintiff for her own damages upon her reaching majority.
In his reasons for judgment, the trial judge found that "sliding glass doors can under certain circumstances, cause a deceptive illusion which could cause injury to an unsuspecting party . . ." Nevertheless, plaintiff was barred from recovery by her contributory negligence. The court finding that "but for plaintiff's haste in exiting the premises she would have been able to detect the glass and would not have collided with and penetrated the glass door which caused her the dreadful injuries. . ." The Court of Appeal agreed with the trial court's conclusion regarding plaintiff's negligence and affirmed. 353 So.2d 1054 (2d Cir. 1978). We granted writs to review the rulings of the lower courts. 355 So.2d 265 (La.1978).
On May 30, 1975 two boys and two girls met at Mrs. Dorothy Fuller's suburban home to cook hamburgers and swim, in celebration of the end of the high school year. One of the boys was Andrew Fluck, Mrs. Fuller's grandson. Mrs. Fuller greeted the young people, then left the house. The boys started a fire in a barbecue pit while the girls changed to bathing suits and prepared the meat.
Between forty-five minutes and one and one-half hours after their arrival, the boys found a water pistol one of the girls had brought and squirted the girls. Susan Roberts began to struggle with David Dies to recover the water pistol, both moving into the den from the kitchen.
The den was about 16' × 23', with some glass on three walls, and a floor paved with random sized broken paving tiles. One of the long walls was almost all glass, designed, said Mrs. Fuller, for "an unrestricted view of the bayou." The glass doors opened to a screened porch which appears to be right on the bank of a body of water; the floor of the porch is an extension of the floor of the den, surfaced with broken pavers and interrupted only by the track for the sliding doors.
The doors were apparently not made of tempered glass or safety glass. Each was 4' wide and 6' 8" tall (6' 8" wooden doors in a residence the age of Mrs. Fuller's house are seldom more than 3' wide) and each was flanked by a stationary glass panel of about the same size. Each glass had stiles and rails of about 3" width. The stiles which met at the center of the opening were slightly wider to accommodate a latch and seal.
Mrs. Fuller said the doors were clean and were open when her grandson and his guests arrived. Andrew and David closed them about ten minutes before the accident to exclude the smoke from the barbecue pit, which sat on the screened porch. The girls had been in and out of the doors several times while they were open, but did not know they had been closed. Judith had probably not been in the den before the day of the accident. Judith was sixteen years old, musical, healthy and had an "A" average in school.
Judith followed David and Susan into the den, joining the play. Susan succeeded in taking the water pistol from David and handed it to Judith who quickly turned toward the porch, took three or four steps and crashed through the glass door, suffering severe cuts.
The gruesome injury suffered by Judith is evidence of the magnitude of the risk created by the glass doors. She fell at the threshold, with her head out of and feet inside the den. Large, heavy fragments of glass pierced her flesh and had to be forcibly removed by the boys to prevent further injury before she could be moved.
Care should increase with the magnitude of the harm which might befall a victim. A large sheet of thin, clean, transparent, untempered, not-laminated glass presents such an obvious risk of serious injury that it must be considered a hazardous *1370 substance. The location of such glass panels, blocking entry and exit through openings in houses designed as passageways multiply the opportunities for serious accidents.[1]
The very least the owner of a building must do is warn a visitor when such a transparent door is closed. The warning is so simple and inexpensive, especially when compared with the risk of harm, that its absence ought not be excused. A decal, decorative tape, paint, or a simple strip of masking tape might be sufficient to prevent serious injury. The homeowner, in the case before us, welcomed the four teen-agers, including her grandson, to swim, cook out and play in the very area where the hazard was greatest.
When there is an apparent danger, foreseeably involving great risk to the unwary, there is a duty to warn. The homeowner's failure to take any steps to prevent accidenther failure to warnwas negligence.
Nor has defendant borne the burden of proving contributory negligence. "Contributory negligence is a special defense and the party relying on such a defense takes the burden of establishing it by a preponderance of the evidence." Foggin v. General Guaranty Insurance Co., 250 La. 347, 363, 195 So.2d 636, 641 (1967). It is not disputed that Judith did not know the previously open doors had been closed, and did not see the glass door until it was too late to stop. Instead, defendant argues that it was her devotion to playing, or her running, or her speed, as found by the trial judge, which prevented her seeing the door. But that was the reason for her presence. She was welcomed to Mrs. Fuller's home for that purpose.
Defendant also argues that the stiles of the glass doors should have made it obvious to Judith that the doors were closed. But the record does not show clearly the position of the sliding doors when Judith saw them before the accident. If both had been wide open, there was an unimpeded 8' wide passageway, and closing the door would have added 5" or so wide vertical aluminum member (the right stile of the left door and the left stile of the right door) in the center *1371 of the 8' opening. But if only one of the glass doors had been open when Judith went in and out, the configuration of the opening remained approximately the same when that door was closed; only the width of the vertical aluminum member in the center of the opening would have changed. Further, if both the doors had been half open before they were closed just before the accident, it is speculative to argue the effect of the position of the vertical members: when both doors are half open, there are six vertical members showing.
Judith was not negligent in playing in the den. That was permitted and expected. The three eyewitnesses were watching when Judith hit the doorSusan was in the act of following Judith out of the room; she screamed when she suddenly realized Judith would crash into the glass. Andrew could not remember whether he called out to Judith. David was watching Judith and did not see the glass, even though he had helped close the doors a few minutes earlier; David only knew Judith had hit the glass because of her fall and the characteristic sound of broken glass.
The "but for" analysis of the trial court and the "had she been attentive" analysis of the Court of Appeal are inadequate to determine contributory negligence. Judith was not under a duty to move slowly. She did not see the glass in time to stop. She was not inattentive. If she had run into a wooden door she would have been inattentive, to say the least. When she succumbed to the illusion of open space (for the creation of which glass doors are employed) she was not negligent. She was looking in the direction in which she was moving, but not until too late to stop did she see that the previously open passageway was now blocked by the closed glass door. Her actions did not constitute fault which caused the accident. The cause of injury was the deceptively clear glass door.
Therefore, the judgments of the lower courts are reversed, and there is now judgment in favor of plaintiffs and against defendant in an amount to be fixed by the Court of Appeal, and all costs. The case is remanded to the Court of Appeal for further proceedings in accordance with this opinion, to fix the sums due plaintiffs from defendant.
SANDERS, C. J., dissents being of the opinion that the judgment of the Court of Appeal is correct. See 353 So.2d 1054.
SUMMERS, J., dissents for the reasons assigned by the Court of Appeal. See 353 So.2d 1054.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
The court of appeal in a unanimous decision affirming the factual conclusion of the trial judge's finding that plaintiff daughter's negligence barred recovery stated: "The record indisputably shows she was an active participant in friendly horseplay when this tragic accident occurred. Had she been attentive to her immediate surroundings and exercised a moderate degree of care, she would not have crashed into the glass door panel and caused her admittedly serious injuries." I agree. Accordingly, I respectfully dissent from the majority opinion reversing the judgments of the lower courts.
NOTES
[1] The National Safety Council reported in 1967 that accidents such as these occurred in 40,000 American homes annually. Safety Newsletter, National Safety Council, Chicago, Illinois, Jury, 1967. See also Annot., 41 A.L.R.3d 176 showing the vast number of cases in other jurisdictions involving collisions with glass doors and panels.

The use of sliding glass doors in locations where they may be subject to human impact has been determined to be hazardous by various building organizations and federal agencies. These entities have drafted proposed minimum standards aimed at safeguarding life, health and the public welfare by regulating and controlling design and construction. See, e. g., Uniform Building Code, Vol. I, by the International Conference of Building Officials, Chap. 54 (1970 Edition); Standard Building Code, by the Southern Building Code Congress International, Inc., Table 2706 (1976 Edition); HUD Minimum Property Standards § 508-8.1. In the above cited standards sliding glass doors have been identified as "hazardous locations" that require the use of safety glazed glass, i. e. glass which has been specially tempered, laminated or fabricated with wire in the core. Such glass is considered to be less likely to shatter upon impact and thus minimizes the chance of injury.
Our own legislature by Acts 1972, No. 719, § 1 (amended by Acts 1974, No. 680, § 1) enacted R.S. 40:1711-15 requiring the use of safety glazing materials in any hazardous location including ". . . installations, glazed or to be glazed in residential buildings and other structures used as dwelling . . . known as sliding glass doors . . . which because of their location present a barrier in the normal path traveled by persons going into or out of these buildings, and because of their size and design may be mistaken as means of ingress or egress." R.S. 40:1711(2). Criminal penalties may be imposed upon those who knowingly sell, fabricate, assemble, glaze, install, consent or cause to be installed glazing materials in hazardous locations. R.S. 40:1713, 1715.
Defendant's insured did not violate this statute, which did not become effective until after the home was built and after the insured became the owner. Nevertheless, we consider the legislative enactment to have been a logical response in an attempt to protect persons from the dangers inherent in the use of transparent sliding glass doors, in particular the possibility that such doors could be mistaken by the unwary as an open passageway.