541 So.2d 910 (1989)
Janice WILLIAMS
v.
EXXON CORPORATION, Oliver Mack and Neal Chellette.
No. 87 CA 1272.
Court of Appeal of Louisiana, First Circuit.
February 6, 1989.
Writ Denied April 17, 1989.
*911 Glenn Marcel, Baton Rouge, for plaintiff-appellee Janice Williams.
Kenneth Barnette, Baton Rouge, for intervenor-appellee St. Paul Fire & Marine Ins. Co.
Myron Walker, Jr., Baton Rouge, for third party defendants-appellee Crotty Bros., Inc., Oakbrook Consolidated, Inc. and Szabo Food Service Co.
William H. Bennett, III and Louise White, New Orleans, for defendant-appellant Exxon Corp.
Before COVINGTON, C.J., and EDWARDS, CARTER, LANIER and LeBLANC, JJ.
CARTER, Judge.
This is an action for personal injury damages.

FACTS
On September 13, 1984, plaintiff, Janice Williams, was employed as a cook by Szabo Food Service Company (Szabo) and was assigned to the cafeteria in the Exxon plant in Baton Rouge, Louisiana. Shortly after arriving at the plant on September 13, 1984, plaintiff was returning to her work area from the restroom when she slipped and fell through a plate glass door located between the lobby and the cafeteria dining room. As a result of this fall, plaintiff suffered serious injuries to her left hand.
On March 18, 1985, plaintiff filed this suit for personal injuries against Exxon Corporation and two of its employees who supervised the Exxon cafeteria, namely Oliver Mack and Neal Chellette.[1] Exxon answered plaintiff's petition, denying liability and asserting numerous defenses. Thereafter, Exxon filed a third party demand against Crotty Brothers, Incorporated (Crotty Brothers) and Oakbrook Consolidated, Inc. (Oakbrook), and Szabo, a principal operating division of Oakbrook. Exxon alleged that the third party defendants are liable to Exxon, pursuant to its indemnity contract with Szabo, for any judgment rendered against Exxon.
*912 On June 10, 1986, St. Paul Fire and Marine Insurance Company, Szabo's worker's compensation insurer, filed a petition of intervention, seeking to recover the worker's compensation and medical benefits paid to plaintiff.
After trial, the jury returned a verdict in favor of plaintiff and against Exxon. Pursuant to specific jury instructions, the jury determined that Exxon was at fault and that such fault was the cause of plaintiff's damages. The jury also determined that Szabo and plaintiff were not guilty of any negligence which caused plaintiff's damages. The jury then awarded plaintiff $604,000.00.
Thereafter, judgment was rendered in favor of plaintiff and against Exxon for $604,000.00, together with court costs and judicial interest. Judgment was also rendered in favor of St. Paul Fire and Marine Insurance Company and against Exxon and plaintiff for $40,999.59,[2] plus all additional sums paid as weekly indemnity or medical payments, costs, and interest. The judgment also dismissed Exxon's third party demand for indemnification against Crotty Brothers, Oakbrook, and Szabo.
On April 9, 1987, Exxon filed a motion for judgment notwithstanding the verdict and, alternatively, for a new trial, which was denied on June 19, 1987.
From these adverse judgments, Exxon appeals, assigning the following errors:
1. The trial court erred in denying Exxon's Motion for JNOV and Motion for a New Trial.
2. The jury's finding that Exxon's fault was a legal cause of any damages sustained by plaintiff was error.
3. The jury's finding that plaintiff and Szabo were not guilty of any negligence which was a legal cause of any damages sustained by plaintiff was error.
4. The trial court erred in awarding excessive damages.
5. The trial court erred in excluding the accident report from evidence.
6. The trial court erred in dismissing Exxon's third party demand against Oakbrook, Crotty Brothers, and Szabo.

Exclusion of Accident Report

(Assignment of Error No. 5)
Exxon contends that the trial court erred in refusing to allow the introduction of the accident report prepared by Szabo following plaintiff's accident. Exxon reasons that such report did not constitute hearsay.
Hearsay evidence is generally inadmissible as being unreliable because it is based on statements made by persons who are not before the court, have not been sworn, and are not available for cross-examination. LaSalle Pump & Supply Co., Inc. v. Louisiana Midland Railroad Co., Inc., 433 So. 2d 745 (La.App. 3rd Cir.1982), writ denied, 435 So.2d 450 (La.1983).
Louisiana courts have recognized the business records exception to the hearsay rule. A four-fold test is generally applied by the courts in determining whether or not business records are admissible in evidence. This test is (1) whether the person who himself made the record is unavailable for testimony or production of said person would be a needless burden; (2) the writing is the first writing reflecting the transaction; (3) the records are identified at trial by one familiar with the bookkeeping procedure used by the business keeping the records; and (4) the evidence is reliable. American Supply Co. of Morgan City, Inc. v. Genina Marine Services, Inc., 470 So.2d 964 (La.App. 1st Cir.), writ denied, 475 So.2d 1107 (La.1985); LaSalle Pump & Supply Co., Inc. v. Louisiana Midland Railroad Co., Inc., supra. See Herlitz Construction Company, Inc. v. Clegg Concrete, Incorporated, 378 So.2d 1002 (La.App. 1st Cir.1979).
Further, when the trial judge rules that evidence is inadmissible, a proffer (offer of proof) can be made. LSA-C.C.P. art. 1636. It is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, *913 he cannot contend such exclusion was error. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La.App. 1st Cir.1984), writ denied, 467 So.2d 531 (La. 1985); Grusich v. Grusich, 447 So.2d 93 (La.App. 4th Cir.1984); Jeffers v. Amoco Production Company, Inc., 405 So.2d 1227 (La.App. 1st Cir.1981).
In the instant case, although Exxon attempted to introduce a copy of the accident report, Exxon failed to proffer such report after the trial judge determined that the evidence was inadmissible. Since Exxon failed to avail itself of the opportunity to proffer this evidence, it cannot now complain that such exclusion was error. Engineered Mechanical Services, Inc. v. Langlois, supra; Canty v. Terrebonne Parish Police Jury, 397 So.2d 1370 (La.App. 1st Cir.), writ denied, 401 So.2d 988 (La.1981).
This assignment of error is without merit.

Factual Finding of Fault

(Assignments of Error Nos. 2 & 3)
Exxon contends that the trial court erred in finding that Exxon's negligence or strict liability was the legal cause of plaintiff's damages. Exxon reasons that the legal cause of plaintiff's damages was plaintiff's own negligence and/or the negligence of Szabo.
The owner, or person having custody, of immovable property has a duty to keep such property in a reasonably safe condition. He must discover any unreasonably dangerous condition on his premises and either correct the condition or warn potential victims of its existence. Farr v. Montgomery Ward and Company, Inc., 430 So.2d 1141 (La.App. 1st Cir.), writ denied, 435 So.2d 429 (La.1983); Haney v. General Host Corporation, 413 So.2d 624 (La.App. 1st Cir.1982); Boutte v. Pennsylvania Millers Mutual Insurance Company, 386 So.2d 700 (La.App. 3rd Cir.1980); Albritton v. J. C. Penney Company, Inc., 385 So.2d 549 (La.App. 3rd Cir.), writ denied, 393 So.2d 727 (La.1980). This duty is the same under the strict liability theory of LSA-C.C. art. 2317 as under the negligent liability theory of LSA-C.C. art. 2315. See Shipp v. City of Alexandria, 395 So.2d 727 (La.1981) and Shelton v. Aetna Casualty and Surety Company, 334 So.2d 406 (La. 1976).
LSA-C.C. art. 2315 provides in pertinent part:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
LSA-C.C. art. 2316 further provides:
Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
Under these articles, the elements of a cause of action in negligence are fault, causation, and damage. Buckley v. Exxon Corporation, 390 So.2d 512 (La.1980); Buxton v. Fireman's Fund Insurance Company, 422 So.2d 647 (La.App. 3rd Cir. 1982).
To establish liability under LSA-C.C. art. 2317, a plaintiff bears the burden of proving three things: (1) the thing which caused damage was in the custody of the defendant; (2) the thing was defective (created an unreasonable risk of injury); and (3) the injury was caused by the defect. Jones v. City of Baton Rouge-Parish of East Baton Rouge, 388 So.2d 737 (La. 1980); Loescher v. Parr, 324 So.2d 441 (La.1975); Carter v. Board of Supervisors of Louisiana State University, 459 So.2d 1263 (La.App. 1st Cir.1984), writ denied, 462 So.2d 1248 (La.1985); McSweeney v. Department of Transportation and Development of Louisiana, 442 So.2d 659 (La.App. 1st Cir.1983). The only difference between the negligent liability of LSA-C.C. art. 2315 and the strict liability of LSA-C. C. art. 2317 is the element of proof of the defendant's scienter. In negligent liability, the plaintiff must show that the defendant either knew or should have known of the defect, whereas under strict liability, the plaintiff is relieved of proving this element. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982); Carter v. Board of Supervisors of Louisiana State University, supra; Buchanan v. Tangipahoa *914 Parish Police Jury, 426 So.2d 720 (La.App. 1st Cir.1983).
In both negligent and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980). Under either theory of liability, the court must decide if the risk which causes the injury is within the ambit of protection of the duty. Hessifer v. Southern Equipment, Inc., 416 So.2d 368 (La.App. 1st Cir.), writ denied, 420 So.2d 982 (La.1982). See Entrevia v. Hood, 427 So.2d 1146 (La.1983).
Further, a defendant's conduct is actionable under the duty-risk analysis where it is both a cause in fact of the injury and a legal cause of the harm incurred. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Fowler v. State Farm Fire & Casualty Insurance Co., 485 So.2d 168 (La.App. 2nd Cir.), writ denied, 487 So.2d 441 (La.1986). See South Central Bell Telephone Company v. Hartford Accident & Indemnity Company, 385 So.2d 830 (La.App. 1st Cir.), writ denied, 386 So.2d 356 (La.1980). The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained. The legal cause test requires that there be a substantial relationship between the conduct complained of and the harm incurred. Sinitiere v. Lavergne, supra; Fowler v. State Farm Fire & Casualty Insurance Co., supra.
In the instant case, under either LSA-C.C. art. 2315 or LSA-C.C. art. 2317, Exxon owes a duty to maintain its premises in a reasonably safe condition. Under either theory of recovery, plaintiff must prove that a defect in the Exxon premises caused plaintiff's injuries.
On September 13, 1984, plaintiff arrived at the Szabo cafeteria in the Exxon Refinery at about 5:00 a.m. Approximately one hour after arriving, plaintiff left the kitchen, traversed the dining area and lobby, and entered the restroom. A set of solid plate glass, aluminum-framed doors, which opened into the dining room, separated the dining area from the lobby. At the time plaintiff travelled through the doors on her way to the restroom, one of the doors had been propped opened and the other door had remained closed. On her way back to the kitchen, plaintiff slipped and fell, falling through one of the plate glass doors. Plaintiff testified that she did not see anything on the floor which caused her to slip and fall. She simply recalls falling through the glass door and cutting her hand when she attempted to break her fall.
Plaintiff testified as follows:
Q. Now, Janice, where on this doorassuming it has glass in itwhere on this door did your hand come in contact with the door?
A. When I went into the door here my hands come in contact with the door here. I hit it and busted it out and knocked this out.
Q. Let the record reflect that she pointed out an area which would be the lower third or the lower half of this metal plate which was on the left-hand side of the door and does not have glass.
A. I was trying to catch.
Q. Was there anything for you to catch hold of?
A. No, there wasn't anything there. I was falling and I was trying to catch something. It wasn't nothing to catch on.
* * * * * *
Q. Now, Janice, if there had been a bar on that door at approximatelyI'm going to point out to you the spot which is the lower part of this plate, this metal plateif there had been a bar at approximately this spot, would you have been able to grab hold of that bar?
A. It would have stopped me. It would have stopped my hand from going up into the glass.
On cross-examination, plaintiff further described how the accident happened as follows:
Q. Do I understand your testimony correctly then that your body basically knocked out the glass?
A. No, not my body.

*915 Q. What part of
A. When I went into it like my knee went into burst it out, compact from my knee by me sliding and going into it, burst it out and by me trying to catch my hand caught those prongs.
Q. So your knee is what hit the glass and broke it in that regard?
A. Not just my knee, no. The compact from my knee and then when I hit it all the glass went out.
Q. But your knee hit it first then your body weight was falling forward and you went through that door, isn't that right?
A. No, I slid. Like I just kind of slid like and when my kneelike me trying to catch on my knee went first and then my body.
Francis Abbott, assistant manager with Szabo, also testified at trial. He testified that Exxon owns the building and fixtures and that Szabo simply prepares and serves food at the site. Abbott was the supervisor on duty at the time of plaintiff's accident. Abbott further testified that for many years the glass doors had been propped open at all times, but that during the last year, the lobby doors had been locked and the doors were opened only when the cafeteria was opened for business.
Shortly after the accident, Abbott carefully examined the area in which the accident occurred. He determined that there were no foreign substances on the restroom or lobby floors which could have caused plaintiff's fall. He also testified that the lobby floor was clean and dry, except for blood and glass which resulted from the accident.
Scott B. Berry, general manager of Szabo, testified that he arrived at work shortly after the accident occurred. Berry also examined the floor, and, like Abbott, he did not find any foreign substance, other than blood and glass, in or around the area in which plaintiff fell. Berry also testified that Exxon owns the building and all of the fixtures inside the building.
W.J. Evans, a licensed architect since 1949 and a licensed civil engineer since 1947, testified at trial on plaintiff's behalf. He was accepted by the court as an expert in architecture, including fire marshall regulations and the breakage tendencies of glass. Evans testified that the glass doors plaintiff fell through were made of ¼ inch polished plate glass. The doors were installed during 1949-50 and were substituted for the ½ inch solid tempered glass doors originally called for in the building plans and specifications. Evans did not know why the substitution was made, but stated that tempered glass doors were readily available at the time. Evans also stated that tempered glass doors were less expensive than plate glass doors.
Evans also explained the differences in the breaking patterns of plate glass as opposed to tempered glass. He testified that tempered glass, because of its high compression, is difficult to break, but once broken it breaks into small pieces. Plate glass, on the other hand, is easier to break and separates into very irregular, jagged pieces with extremely sharp edges. He concluded that a person is more likely to receive serious injury from polished plate glass than from tempered glass.
Evans further testified that there were no push bars on the doors, although they were required in the original plans and specifications and in the modified specifications. He stated that it was below industry standards not to have push bars on plate glass doors and that push bars would prevent a person from falling through the door. Evans opined that there are three distinct reasons for the inclusion of push bars on glass doors. First, push bars afford a place to push the door open. They also signal persons approaching that the doors are there. Finally, push bars act as guards to prevent walking or falling through the door. When asked if push bars would have prevented the accident, Evans asserted that, although there is no guarantee that the push bars would have prevented the accident, it was his opinion that plaintiff's injury would not have been as severe had push bars been in place.
Evans also testified that it was widely known that plate glass doors were dangerous *916 in the early 1960's. By the mid 1960's building codes and regulations, which required the use of plate glass, mandated the use of push bars. He added that the law now requires the use of safety glass. Evans testified that, although the law did not require Exxon to replace the plate glass with safety glass, Exxon should have made the change out of concern for safety and that, regardless of the position of the doors (opened or closed), the plate glass was hazardous.
Exxon presented the testimony of John L. Webb, an architect and engineer. Webb is licensed in several states including Louisiana and was accepted by the court as an expert in architecture.
Webb testified that the original plans and specifications called for ¾ inch tempered glass doors known as Herculite doors, which were changed by modification of the building contract. He further testified that the original specifications included the use of push bars. Webb asserted that tempered glass has been available since Roman times, but that when the building was built (in 1950) it was common practice to use plate glass. Webb testified that it was also common practice in 1950 to install push bars on plate glass doors.
Webb stated that the Life Safety Codes in effect at the time the building was constructed did not prohibit the practice followed by Exxon in construction, but acknowledged that compliance with the codes is done more or less on a voluntary basis. Webb testified that, in his opinion, the accident would not have been prevented by the use of push bars. Webb reasoned that the door did not cause plaintiff to fall, but merely got in her way as she was falling. Webb further testified that plaintiff's knee initially made contact with the plate glass door and actually caused the door to break. Plaintiff's hand merely came in contact with the door as she fell. Webb testified that he could not say that, had there been a push bar, she would not have been injured.
Webb also testified that, in his opinion, the accident would not have been prevented if tempered glass had been installed instead of plate glass, primarily because the door did not cause plaintiff's fall. Webb acknowledged, however, that the use of tempered glass would lessen the possibility that a person falling into it would be cut. He also acknowledged that plaintiff's injuries would not have been as severe had the door been made of tempered glass. He stated that tempered glass has about four times the impact resistance as plate glass and, if tempered glass is broken, it breaks into small pieces. Webb further agreed that plaintiff's fall did not cause her injuries, but that her fall into the plate glass door caused them.
Exxon also called Jerry W. Jones, chief architect for the State Fire Marshall's office. Jones has a degree in architecture and was licensed as a professional architect in 1984. Jones had been employed by the State Fire Marshall's office since 1981. The court accepted Jones as an expert in interpreting fire marshall regulations.
Jones opined that the set of plate glass doors involved in the instant case complied with the fire marshall regulations in existence when the building was constructed. Jones testified that if he had inspected the doors in the cafeteria the day before plaintiff's accident, he would not have ordered Exxon to make any changes. On cross-examination, however, Jones acknowledged that he would not have ordered Exxon to make any changes because his office does not have the authority to order the removal of the doors. Jones stated that if he had known that the doors were made of plate glass, and not safety glass, he would have at least made a verbal recommendation to install safety glass. He further acknowledged that, if after inspecting the premises he felt the hazard was severe, he would have put his recommendation in writing. He also testified that plate glass doors were recognized as hazardous in the late 1960's and early 1970's, which prompted the Consumer Product Safety Commission to address the issue.
In the instant case, the pivotal issue is whether the use of plate glass doors, without push bars, constitutes an unreasonable risk of harm.
*917 Exxon contends that the jury erred in finding it was solely at fault. Exxon contends that plaintiff was solely at fault. In support of this contention, Exxon relies on Wilson v. Allstate Insurance Company, 278 So.2d 814 (La.App. 4th Cir.1973), Veillon v. State Farm Fire & Casualty, 424 So.2d 477 (La.App. 5th Cir.1982), and Miguez v. Urban Developments, Inc., 451 So.2d 614 (La.App. 5th Cir.), writ denied, 452 So.2d 1176 (La.1984). Exxon's reliance on these cases is misplaced, and each case is clearly distinguishable from the instant case.
In Wilson v. Allstate Insurance Company, supra, the trial judge determined, and the appellate court affirmed, that plaintiff's own negligence was the proximate cause of her injuries.[3] The court stated:
We are however of the opinion that Debra Lynn Wilson was negligent and that her negligence was the proximate cause of the accident. It is an uncontested fact that Debra knew the door was there as she herself closed it an hour beforehand. Having done so she is charged with the knowledge of its presence. She also admitted that the door was not invisible and could be seen from across the room. Therefore we are constrained to find that had Debra been exercising reasonable attention to her surroundings, the accident would not have occurred. [278 So.2d at 816].
Likewise, in Veillon v. State Farm Fire & Casualty, supra, the jury determined that although the individual defendant was negligent, his negligence was not a proximate cause of the accident. The jury determined that plaintiff was guilty of contributory negligence, which barred his recovery.[4] The court stated:
Our finding of negligence on the part of the plaintiff is based upon the fact that, as stated above, while continuing to run he looked back over his shoulder to see if the other boy was still chasing him and turned to look forward just as he ran into the glass door. We are satisfied that under all of the circumstances here plaintiff would have run into the glass door even if it had contained decals, masking tape or similar devices to indicate the door was closed. Indeed, it appears he would have run into the door even if it had been made of wood instead of glass. Plaintiff's negligence was the sole proximate cause, or sole cause in fact, of the accident. Even assuming negligence on the part of the individual defendant, as the jury found, and further even assuming such defendant negligence was a proximate cause of the accident, which the jury correctly refused to find, plaintiff's contributory negligence would prevent any recovery. [424 So.2d at 478-479].
In Miguez v. Urban Developments, Inc., supra, the trial judge determined that the legal cause or cause in fact of the injury to plaintiff was a result of the fight in which he willingly participated. Accordingly, the trial judge found that victim fault and/or third party fault relieved defendants from strict liability. The court stated:
In determining cause-in-fact, it must be decided whether the acts complained of were a substantial factor without which the accident would not have occurred. Head v. St. Paul Fire and Marine Ins. Co., 408 So.2d 1174 (La.App. 3rd Cir. 1982). The trial court's finding was obviously correct, and the only duty breached was the mutual obligation of Michael and Dudley to refrain from deliberately injuring one another. [451 So.2d at 616].
In the instant case, the evidence clearly established that plaintiff left her work area to use the restroom and, upon her return, slipped and fell into the plate glass door. The evidence also shows that there were no foreign substances on the restroom or lobby *918 floors which caused plaintiff to fall. From the evidence, it appears that plaintiff was carefully and cautiously returning to her assigned work area, was maintaining a proper lookout, and was proceeding in a safe and prudent manner, when she slipped and fell into the plate glass doors, seriously injuring herself.
In determining liability, the jury determined that Exxon was solely at fault, which was the legal cause of plaintiff's damages. Generally, care should increase with the magnitude of the harm which might befall a victim. Large, thin, clear, transparent, untempered, plate glass doors, without any push bars, present such an obvious risk of serious injury that it must be considered hazardous. See Dixon v. Allstate Insurance Co., 362 So.2d 1368 (La.1978). The location of such glass doors in entry and exit openings designed as passageways in heavily travelled areas multiply the opportunities for serious accidents.
Exxon further contends that its compliance with existing building codes is exculpatory. This alone, however, does not relieve Exxon of liability.
While the use of plate glass did not violate any legislative enactments, which now prohibit the use of plate glass, and Exxon was not legislatively mandated to retrofit the doors, we consider the legislative enactments to have been a logical response to an attempt to protect persons from the dangers inherent in the use of plate glass doors. See Dixon v. Allstate Insurance Co., supra. Further, the testimony established that the use of plate glass, though not unlawful, was considered hazardous. See Morrison v. Clearview Medical Plaza, 357 So.2d 1386 (La.App. 4th Cir.), writ refused, 359 So.2d 622 (La.1978).
The evidence at trial clearly established that the plate glass doors were in the custody of Exxon, that the plate glass doors created an unreasonable risk of harm, and that plaintiff's injury was caused by this defect. Further, the evidence also demonstrated that Exxon knew or should have known of such defect. Accordingly, we find that the jury properly determined that Exxon was solely at fault in causing plaintiff's damages.
These assignments are without merit.

Quantum

(Assignment of Error No. 4)
In this assignment of error, Exxon contends that the jury erred in assessing quantum. Exxon reasons that the award of $604,000.00 is excessive.
We have a constitutional duty to review the law and facts and render a judgment on quantum based on the merits, determining whether the trier of fact abused the "much discretion" that the law accords it in awarding damages. LSA-Const. art. 5, § 10(B); LSA-C.C. art. 1999; Ard v. Samedan Oil Corporation, 483 So. 2d 925 (La.1986); Carollo v. Wilson, 353 So.2d 249 (La.1977); Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976); Sexton v. Louisiana Vacuum Services, Inc., 506 So.2d 780 (La.App. 1st Cir.1987).
When we review either an in globo award or a particularized award, whether made by a trial judge or of a jury, we consider the legal sufficiency of the proof of the elements of damage that are claimed in the light of the discretion afforded the trier of fact to assess damage or damages. We consider what elements of damage were proved, the range of the amount that might have been assessed for each particular element, and whether the total for all elements (or the in globo amount) was within the trier of fact's discretion. Wactor v. Pickens Lumber Company, 505 So.2d 815 (La.App. 2nd Cir.), writ denied, 508 So.2d 827 (La.1987). See Mullin v. Vessier, 400 So.2d 1192 (La.App. 1st Cir. 1981).
Further, a jury is granted great discretion in fixing an award for general damages which cannot be fixed with any degree of certainty, such as pain and suffering. In such cases, our review must be limited to a determination of whether the jury has abused its discretion, based on the circumstances of the case. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977); Cage v. Shainberg's Stores of La., *919 413 So.2d 564 (La.App. 1st Cir.1982); Rheams v. McCray, 346 So.2d 834 (La.App. 1st Cir.1977); Averett v. Alexander, 336 So.2d 227 (La.App. 1st Cir.1976). And, since the jury does have much discretion in fixing damages, the appropriate procedure for testing whether the jury abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977); Cage v. Shainberg's Stores of La., supra; Bevil v. Heath Timber Company, Inc., 347 So.2d 889 (La.App. 3rd Cir.1977).
In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by lowering (or raising) it to the highest (or lowest) point which is reasonably within the discretion afforded the trier of fact. Ard v. Samedan Oil Corporation, supra; Reck v. Stevens, 373 So.2d 498 (La.1979); Carollo v. Wilson, supra; Coco v. Winston Industries, Inc., supra; Sexton v. Louisiana Vacuum Services, Inc., supra.
Accordingly, in the instant case, we must first examine the record to determine whether it reveals that the trial court abused its discretion in its award to plaintiff. If we find an abuse of discretion, the award should be reduced to the maximum amount or increased to the minimum amount which is reasonably within the discretion of the trial court.
In the instant case, plaintiff testified that immediately after the accident, she and a co-worker went into the cafeteria to bandage her left hand, which was bleeding profusely. Plaintiff was then taken by Exxon's rescue unit to the Baton Rouge General Hospital, where medical personnel stitched plaintiff's wounds.
After receiving treatment, plaintiff returned to Exxon. While there, her wounds again began to bleed. Dr. Nealy, Exxon's on-site physician, attempted to stop the bleeding and gave plaintiff medication for pain. Plaintiff saw Dr. Nealy for the next eight days. When Dr. Nealy removed the stitches from plaintiff's hand, plaintiff's wounds opened, and she again began to bleed. Thereafter, Szabo sent plaintiff to Dr. Joe Morgan, an orthopedic surgeon, who performed surgery on plaintiff's hand. Plaintiff testified that she remained awake during this surgery, although she was given a nerve block.
Plaintiff further testified that she began having pain on the day of the accident and experienced extreme pain in her wrist daily. On the day of trial, plaintiff stated that she continued to experience pain on and off every day. The pain usually began in her wrist and split down into her two numb fingers. Although plaintiff had prescribed pain medication, she took aspirin during the day and utilized the pain pills only at night. Plaintiff explained that she refrained from using the prescription medication during the day because it induced drowsiness. Plaintiff further testified that although the aspirin does not completely alleviate her pain, it does reduce the pain to a tolerable level. Despite the medication, plaintiff has trouble sleeping at night because when she inadvertently touches her hand, shocking pain radiates up her arm.
Plaintiff further testified that, after Dr. Morgan performed the initial surgery, her hand was placed in a cast, which extended to her elbow. She was thereafter hospitalized for almost eleven days because of an infection. While hospitalized, plaintiff received physical therapy which she described as follows:
Q. During that time you were in the hospital what was done for your hand?
A. He had taken all the stitches out and they would come get me every morning, take me down to therapy and put it in the whirlpool. Then she would come with a little thing and put my hand on it and then she would pick all the dead flesh and everything out of it.
Q. What would she use to pick in it?
A. Something about like that, it looked like big tweezers.
Q. Did it cause you any pain?
A. Yes, indeed.
*920 Q. When your hand was open and she was doing that could you see any bone?
A. I couldn't see nothing but looked like dead raw meat in it. They had to do it everyday.
Plaintiff also underwent two subsequent surgeries.
Plaintiff further testified that she underwent physical therapy three times a week from approximately October 18, 1984, until November 25, 1985. Plaintiff testified that the therapy consisted of placing her hand in a hot wax box, then placing her hand in a hot sand box for approximately thirty minutes. Thereafter, the therapist would massage plaintiff's hand and fingers and then have plaintiff exercise the hand. Plaintiff was often in pain to the point of screaming and crying. Plaintiff continues to do physical therapy at home.
Plaintiff testified that after the accident her hand was swollen and remains several times larger than her uninjured hand. To reduce the swelling, plaintiff wears a Jobst glove. Plaintiff attempted to wear three different Jobst gloves until one was found which could be worn comfortably. The two earlier gloves constricted her hand, failed to reduce the swelling, and caused pain. Although the third glove does not keep plaintiff's hand from swelling, she is able to wear it without significant pain.
The injuries plaintiff sustained have drastically changed her life. Prior to sustaining the injuries to her left hand, plaintiff enjoyed gardening, bike riding, and fishing, but she has been unable to do either since her accident. When plaintiff attempts to cook at home, if she inadvertently touches her left hand, she jerks from pain and burns herself. Further, she is unable to drive a vehicle and must depend on neighbors, friends, or the state van to make doctor appointments. Plaintiff does not drive herself because she fears that she will bump her hand, lose control of her vehicle, and injure someone. Further, plaintiff's hand has remained scarred, primarily on the top of her hand and wrist.
Plaintiff has virtually no use of her left handshe cannot lift a book, pour milk out of a carton, or brush her hair or teeth. Plaintiff testified that because of her physical condition, she cannot return to her former job and cannot perform any task which requires the use of two hands or involves eight hours of activity because prolonged activity causes her left hand to swell.
Dr. Joe Morgan also testified. Dr. Morgan first examined plaintiff on September 25, 1984. Plaintiff's history revealed that she had sustained a laceration on the back of her left wrist on September 14, 1984. The laceration was repaired at the emergency room at the Baton Rouge General Hospital. Dr. Morgan's examination showed that the index finger of plaintiff's left hand had been partially amputated from previous injury. He also observed a healing raised laceration on the back of the left wrist. There was also some weakness of extension of the index and middle fingers and the ring finger. X-rays of the hand revealed no abnormalities. Dr. Morgan's initial impression was that plaintiff had reactive synovitis and partial laceration of the extensor tendons to the index, long, and ring fingers of the left hand.
Dr. Morgan recommended and performed surgery on September 26, 1984. The surgery revealed a partial laceration of the extensor tendon to the index finger. Dr. Morgan also found evidence of synovitis within the extensor tendons. Dr. Morgan placed plaintiff's hand in a plaster splint. Thereafter, plaintiff developed an infection, and on October 1, 1984, she developed drainage from the surgical site. Plaintiff was then admitted to the hospital to treat the infection and was discharged on October 11, 1984.
Dr. Morgan testified that plaintiff initially had swelling from the accident and continues to experience swelling. He noted that the swelling appears to have increased over time and that the swelling plaintiff now experiences is greater than it was immediately after the accident.
While treating plaintiff, Dr. Morgan observed that plaintiff was unable to make a fist with her left hand and prescribed physical therapy. Dr. Morgan testified that plaintiff underwent physical therapy on a *921 regular basis until April 1, 1985, when he performed another surgery on plaintiff's left hand. Dr. Morgan explained that:
She had tenderness over the palmar aspect of her wrist, carpal tunnel area. Had a nerve conduction test performed that showed delay in the median nerve conduction. It was compatible with a carpal tunnel syndrome. I took her to surgery for release of that and I also did surgery on the back of her hand and wrist to try to help relieve the swelling and try to improve the drainage. She was improved for a while with that but it didn't last.
Plaintiff subsequently returned to physical therapy on April 15, 1985, but she failed to improve. Dr. Morgan indicated that the shock-like sensations plaintiff experiences are due to an interruption of the sensory branch of the radial nerve, which probably occurred when she initially cut her hand. Dr. Morgan opined that nerve injury, which combined with the infection, probably caused the injuries plaintiff currently experiences.
Dr. Morgan testified that he does not contemplate performing any additional surgeries because he does not feel that plaintiff will improve. In his opinion, plaintiff is currently experiencing sympathetic dystrophy, which is a condition of the autonomic nervous system. Dr. Morgan further testified:
Q. Doctor, is it a reasonable alternative at this point to amputate her hand?
A. I don't really think so, because if she had an amputation this condition of sympathetic dystrophy may just be transferred to an amputation stump. I don't think that that'sI would be very hesitant to recommend that.
Q. So if you amputated her hand the pain would go up into her forearm?
A. I couldn't predict that it wouldn't.
Q. But you've seen and read cases of that happening?
A. Well, we don't know how to cure sympathetic dystrophy completely. We know how to treat it, and some cases will respond and will recover and others won't. We have to be very cautious about operating on sympathetic dystrophy for not just adding to the problem.
With regard to plaintiff's current disability, Dr. Morgan testified:
Q. Doctor, I want to make sure I understand. The problems that Janice is currently having with her hand you foresee that she is going to probably have those for the rest of her life?
A. Yes.
Q. Doctor, is it your opinion that Janice is permanently disabled from performing manual labor?
A. Manual labor as I understand manual labor is something that requires use of both hands, lifting, carrying, manipulating, gripping, releasing, and if I understand it to be that, yes, she is disabled from that.
Terri Todd Wilton, a licensed occupational therapist, testified as an expert witness on plaintiff's behalf. Wilton testified that she first saw plaintiff on March 11 and 12, 1986. Initially Wilton performed the functional capabilities evaluation, which is a standardized evaluation consisting of seventeen different test items. The goal of the assessment is to determine the functional abilities of an injured person. Wilton explained what the tests are designed to measure as follows:
In general what the test does is look at general cardiovascular fitness and endurance. We look at strength in her legs and her arms. We look at how well she can perform hand manipulation activities, how well she can use her arms and also her legs in many job activities. Our findings for Ms. Williams was that she had general decreased strength and endurance. Her number one weakness was her non-functional use of her left hand, and that was determined by a series of hand manipulation activities, testing her strength in that hand and just seeing how well she could use it to assist her right hand in any different activities. And that was her major limiting factor through the assessment.
Specifically, the test results revealed that plaintiff performed adequately with her *922 right hand and could perform activities like walking, kneeling, stooping, etc. However, the tests performed with plaintiff's left hand revealed that her grip strength was functionally limited and that she was unable to perform coordination activities and overhead work.
Wilton also measured plaintiff's hand on each day of her evaluation both before and after testing. The measurement had to be made manually with a tape measure because plaintiff's hand was too large to place into the volumeter. The measurements revealed that plaintiff's hand showed a marked increase in swelling after testing on each day. Wilton also testified that plaintiff often complained of pain during the tests.
After complete evaluation, Wilton determined that plaintiff could not safely perform manual labor. Wilton testified that, even if the work involved using only her right hand, plaintiff could not perform the work because her left hand would inevitably be affected due to the pain and swelling. Wilton concluded that plaintiff could not be placed for employment.
Dr. Jan W. Duggar, an economist, was called by plaintiff and was accepted by the court as an expert for purposes of computing lost wages. Dr. Duggar explained that his calculations would include past lost wages from the time of the injury until the date of trial and a separate calculation for future lost wages from the date of the trial until the end of plaintiff's expected worklife.
Dr. Duggar estimated plaintiff's past lost wages to be $30,015.00. This figure included an allowance for certain fringe benefits, such as employer provided medical insurance, social security payments, and vacation pay.
Dr. Duggar estimated plaintiff's future lost earnings to be $178,712.00, using a discount of 8% and a 6% increase factor. This figure was also based on an expected worklife of 17½ years (until plaintiff reached age 65). Dr. Duggar offered other figures based on different discount values and worklife expectancies. The lowest calculation made by Dr. Duggar was $109,623.00, and the highest calculation was $195,036.00. When added to past lost wages, total lost earnings (both past and future) are respectively $139,638.00, $208,727.00, and $225,051.00. Dr. Duggar acknowledged that these calculations did not include the cost of meals currently provided to plaintiff by her employer.
Exxon called Dr. Kenneth J. Boudreaux, a professor of economics and finance at Tulane University, who was accepted as an expert economist.
Dr. Boudreaux based his calculation of future lost earnings on a worklife expectancy of 8.87 years and used $10,440.00 as plaintiff's wage base. He estimated future lost income between $71,890.00 and $80,610.00 and past lost income at $26,098.00.
Dr. Boudreaux rejected the age 65 basis for a worklife calculation. Instead, he used tables provided by the U.S. Government, which are reflective of the attrition of women from the work force. The tables included married women and all others who drop out of the work force for whatever reason.
Dr. Boudreaux estimated that plaintiff's wages would have increased over her worklife from 2% to 5%. He based this estimate on a historical average income increase from as early as 1913. Dr. Boudreaux did not include any fringe benefits in his calculations. He testified, however, that fringe benefits are a valid consideration and that he did not use them because he did not know what they included.
After thoroughly reviewing the entire record, we cannot say that the jury abused its much discretion in awarding quantum. The evidence established that plaintiff sustained a serious and painful injury to her left hand. The hand is physically deformed and has little or no functional value. Although the injury occurred in 1984, the medical evidence established that plaintiff would continue to suffer from pain indefinitely. The expert testimony established that plaintiff is unable to return to work as a manual laborer and has sustained lost wages, both past and future, of between approximately $98,000.00 and $225,000.00.
*923 Considering all of the foregoing, we cannot say that the jury erred in awarding quantum based upon the circumstances of the instant case.
This assignment is without merit.

Motion for Judgment Notwithstanding the Verdict and, alternatively, For a New Trial

(Assignment of Error No. 3)
In this assignment of error, Exxon contends that the trial judge erred in denying its motion for judgment N.O.V. and, alternatively, for a new trial.
A. Motion for Judgment N.O.V.
The standard for a trial court to follow in granting a judgment N.O.V. is to determine whether, after considering all of the evidence in the light most favorable to the party opposed to the motion, the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict on the issue. Stafford v. Unsell, 492 So.2d 94 (La.App. 1st Cir.1986); Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.), writ denied, 476 So.2d 353 (La.1985). In reviewing the granting of a motion for judgment N.O.V. on the issues of liability and damages, the appellate court must examine the record to determine whether the trial court's conclusions on liability and quantum were manifestly erroneous. Robertson v. Penn, supra.
The ground for Exxon's motion for judgment N.O.V. was that the evidence at trial pointed so strongly and overwhelmingly in favor of Exxon that reasonable men could not have arrived at a contrary verdict. Exxon reasoned that the evidence on liability clearly showed that plaintiff's negligence was the sole proximate cause of the accident. Exxon further reasoned that the quantum award was excessive.
Based upon our previous findings in assignments of error two, three, and four, we cannot say that the trial court's findings were manifestly erroneous.
B. Motion for New Trial
Further, peremptory grounds for granting a new trial in a jury case are present if it be proven that the verdict or judgment appears clearly contrary to the law and the evidence, there is newly discovered evidence which could not, with due diligence, have been obtained previously, or the jury was bribed or behaved improperly so that impartial justice has not been done. LSA-C.C.P. art. 1972. Otherwise, the trial judge is granted wide discretion in allowing or denying the motion. LSA-C.C.P. art. 1973. Miller v. Chicago Insurance Company, 320 So.2d 134 (La.1975); Conner v. Florida Farm Bureau Casualty Insurance Company, 446 So.2d 383 (La.App. 3rd Cir. 1984).
In reviewing the grant or denial of a motion for new trial, we are bound to affirm absent clear error in the findings of fact or abuse of discretion in assessment of the award. Karl v. Amoco Production Company, 507 So.2d 263 (La.App. 3rd Cir.), writ denied, 512 So.2d 461 (La.1987); LeBlanc v. Gibbens Pools, Inc., 447 So.2d 1195 (La.App. 5th Cir.), writ denied, 450 So.2d 958 (La.1984).
Exxon filed the alternative motion for new trial, contending that the quantum award was excessive and the verdict on liability was contrary to the law and the evidence.
In the instant case, based upon our findings in assignments of error numbers two, three, and four, we cannot say that the trial judge erred in refusing to grant Exxon's motion for new trial.

Third Party Demand

(Assignment of Error No. 6)
Exxon contends that the trial court erred in dismissing its third party demand for contractual indemnity against Szabo. Exxon reasons that under the indemnity agreement Szabo is liable for its proportionate share of fault in negligence as well as any and all strict liability.
On or about May 22, 1982, Exxon and Szabo entered into an agreement wherein Szabo agreed to operate and provide food *924 services at the Exxon Refinery in Baton Rouge. The original contract provided for indemnification as follows:
Contractor [Szabo] shall be responsible for any loss of or damage to existing structures and other property belonging to Owner [Exxon] or for which Owner is responsible (other than the Work) and for any loss or damage to property of others arising out of, or in connection with, or by reason of, Work done by Contractors, its employees, agents, representative, or subcontractors under this contract, expressly excepting any loss or damage caused by the sole negligence of Owner, its employees, agents, or representative. (emphasis added).
Thereafter, on about July 2, 1982, the language of the indemnity agreement was amended to delete the word "sole."
On appeal Exxon contends that under the amended indemnity agreement, Szabo should indemnify Exxon for any and all fault attributable to Szabo and for any and all strict liability.
The Louisiana Supreme Court recently addressed the issue of indemnification in Soverign Insurance Company v. Texas Pipe Line Company, 488 So.2d 982 (La. 1986). In interpreting an indemnification agreement, which is substantially similar to the instant indemnification agreement,[5] the court stated:
When a contract of indemnity makes no express provisions for indemnification against the consequences of the indemnitee's negligence, and an unequivocal intention to so indemnify cannot be found after interpreting each contractual provision in light of the whole contract and the general rules of contractual interpretation, the court will presume that the parties did not intend to hold the indemnitee harmless from such liability. On the other hand, this presumption does not apply to the question of whether the parties intended to indemnify against the indemnitee's strict liability under Civil Code article 2317. [488 So.2d at 983].
The court also found that strict liability was within the contemplation of the parties when they agreed that indemnity should cover each and every claim, demand or cause of action, and liability, except for those resulting solely from Texas' negligence. Soverign Insurance Company v. Texas Pipe Line Company, supra.
In the instant case, the jury determined, and we agree, that plaintiff's damages were caused by the sole negligence of Exxon. As Exxon is 100% at fault, it is not entitled to indemnification under the contract. Accordingly, we find that the trial judge properly denied Exxon's third party demand for indemnification.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed in all respects. Exxon is cast for all costs.
AFFIRMED.
LeBLANC, J., dissents and assigns reasons.
LANIER, J., dissents and joins in the reasons assigned by LeBLANC, J.
LeBLANC, Judge, dissenting.
We respectfully dissent, concluding the harm suffered by plaintiff was not within the ambit of protection of any duty owed to plaintiff by Exxon.
*925 The majority opinion apparently predicates Exxon's liability both on theories of negligent liability under La.C.C. art. 2315 and strict liability under La.C.C. art. 2317. Regardless of which theory is relied upon for recovery, the court must initially determine what duties the defendant owed to the plaintiff, and then whether the risk which caused the injury was within the scope of these duties. Farr v. Montgomery Ward and Co., Inc., 430 So.2d 1141 (La.App. 1st Cir.) writ denied, 435 So.2d 429 (1983). The duties owed to the plaintiff are exactly the same under both theories of liability. Id.
It is not seriously disputed that the use of plate glass doors such as those in this case falls below today's safety standards. The majority holds that by failing to replace the plate glass in the doors with safety glass, Exxon breached its duty to correct an unreasonably dangerous condition on its premises and is therefore liable for plaintiff's resulting injuries.
We agree with the majority's statement of law to the effect that the owner of an unreasonably dangerous thing generally has a duty either to correct the unreasonably dangerous condition created by the thing or warn of its existence. However, the majority fails to properly recognize that this general rule has been legislatively modified to eliminate the duty to correct (by replacement with safety glass) the dangerous condition created by the use of plate glass doors which were installed before January 1, 1973. La.R.S. 40:1713[1] made it unlawful for plate glass to be used in certain locations where people are commonly present. However, this provision specifically provided that its application was to be prospective only from its effective date of January 1, 1973. The doors involved herein were installed in 1949-50.
The legislature's decision to make this provision prospective only was obviously based upon its balancing of competing interests, including the economic costs involved in replacing plate glass with safety glass in residential, commercial and public buildings throughout Louisiana. In view of the clear manifestation of legislative will evidenced by the provisions of La.R.S. 40:1713, we disagree with the majority's conclusion that Exxon had a duty to replace the plate glass doors with safety glass. The majority erred in finding Exxon liable on the basis that it breached this duty to plaintiff.
Although Exxon as discussed above had no duty to replace the plate glass doors, it did have a duty to warn of the dangerous condition it created. The majority opinion does not examine this duty under a duty-risk analysis. From our own analysis, we conclude that plaintiff's injury did not fall within the scope of Exxon's duty to warn plaintiff. The duty to warn in situations involving plate glass doors is directed primarily to the possibility that unwary persons might mistake the closed glass doors as an open passageway and walk into them. See, Dixon v. Allstate Ins. Co., 362 So.2d 1368, 1370 (La.1978). In this case, Exxon posted no warnings regarding the doors. However, we do not believe the risk that someone who was fully aware of the doors existence might stumble without apparent cause and fall through the doors was a risk which the duty to warn was intended to prevent. See, Dartez v. City of Sulphur, 179 So.2d 482 (La.App. 3rd Cir. 1965). Plaintiff's injuries occurred, not as a result of Exxon's failure to warn of the danger created by the existence of the doors, of which plaintiff was fully aware, but as a result of plaintiff's inexplicable fall. A warning of the doors condition obviously would not have prevented plaintiff from falling and receiving injuries. Even a general warning to proceed with caution, if defendant had a duty to give such a warning, would not have prevented plaintiff's injuries, since the record reflects *926 that plaintiff was walking in a safe and prudent manner when she stumbled and fell without any apparent cause. Accordingly, even though Exxon breached its duty to warn, it is not liable for plaintiff's injuries because the particular risk causing those injuries was not within the ambit of protection afforded by Exxon's duty to warn.
Since plaintiff failed to establish that her injuries resulted from the breach of any duty Exxon owed to her, the jury erred in assigning any fault to Exxon. Judgment should have been rendered in favor of Exxon dismissing plaintiff's suit on the main demand.
Since we find that plaintiff's main demand against Exxon should be dismissed, we further find that the third party demand for contractual indemnity against Szabo should be dismissed. Nevertheless, since the majority opinion addresses this issue, we feel compelled to analyze the majority's reasoning on this issue. The majority's analysis compares the pertinent contractual indemnification language in this case with the contractual indemnification language in Soverign Insurance Company v. Texas Pipe Line Company, 488 So.2d 982 (La.1986). The analysis notes that the indemnification language in Soverign is similar to the indemnification language in the present case. The analysis explains that in Soverign the Supreme Court found that the parties to the indemnification intended to include indemnification for the indemnitee's strict liability. Then, the focus of the majority opinion abruptly shifts to Exxon's negligence. The majority reasons that Exxon is not entitled to indemnification in the present case because the jury determined that plaintiff's damages were caused by the sole negligence of Exxon. Since the indemnification language in this case expressly excludes indemnification by Szabo of any loss or damage caused by the negligence of Exxon, the majority reasons that Szabo is not liable to Exxon for indemnification. However, the majority reasoning disregards the fact that it has premised Exxon's liability pursuant to the main demand on principles of strict liability as well as negligent liability. Furthermore, the majority misstates the jury's findings. The interrogatories show that the jury found Exxon to be legally at fault in causing the accident. The interrogatories made no distinction between negligent or strict liability. Thus, we feel the majority opinion fails to address the significant issue of whether the present contract provides indemnity by Szabo against Exxon's strict liability under La.C.C. art. 2317.
NOTES
[1] By order dated July 15, 1986, plaintiff dismissed, without prejudice, her claims against Neal Chellette and Oliver Mack.
[2] At trial, the parties stipulated that, as of that date, St. Paul Fire and Marine Insurance Company had paid plaintiff worker's compensation and medical benefits totalling $40,999.59.
[3] The accident in Wilson v. Allstate Insurance Company, 278 So.2d 814 (La.App. 4th Cir.1973), occurred on June 9, 1970, prior to the effective date of Acts 1979, No. 431, which amended and reenacted LSA-C.C. art. 2323 and changed our long existing law of contributory negligence to that of comparative negligence.
[4] The accident in Veillon v. State Farm Fire & Casualty, 424 So.2d 477 (La.App. 5th Cir.1982), occurred on January 1, 1978. See footnote 3.
[5] In Soverign Insurance Company v. Texas Pipe Line Company, 488 So.2d 982 (La.1986), the indemnity agreement provided as follows:

Contractor [Atlas] shall fully defend, protect, indemnify and hold harmless the Company [Texas], its employees and agents from and against each and every claim, demand or cause of action and any liability, cost, expense (including but not limited to reasonable attorney's fees and expenses incurred in defense of the Company), damage or loss in connection therewith, which may be made or asserted by Contractor, Contractor's employees or agents, subcontractors, or any third parties, (including but not limited to Company's agents, servants or employees) on account of personal injury or death or property damage caused by, arising out of, or in any way incidental to, or in connection with the performance of the work hereunder, whether or not Company may have jointly caused or contributed to, by its own negligence, any such claim, demand, cause of action, liability, cost, expense, damage or loss, except such as may result solely from the Company's negligence.
[1] La.R.S. 40:1713 provides as follows:

It shall be unlawful within the State of Louisiana to knowingly sell, fabricate, assemble, glaze, install, consent or cause to be installed glazing materials other than safety glazing materials in, or for use in, any hazardous location, as defined herein above, after the effective date of this Part. This Part shall not be construed as being retroactive and shall become effective on January 1, 1973.
This statute is part of La.R.S. 40:1711-1715 enacted by Acts 1972, No. 719.