582 So.2d 919 (1991)
Eddie Mae SHAW, Janice Marie Toliver, Ruby Lee Shaw Petteway, Nathaniel Shaw, Jr., and Gerlene Shaw Phillips, Plaintiffs-Appellants,
v.
FIDELITY & CASUALTY INSURANCE COMPANY and Eola B. Watson, Defendants-Appellees.
No. 22,478-CA.
Court of Appeal of Louisiana, Second Circuit.
June 19, 1991.
*921 Robert A. Jahnke, Shreveport, for plaintiffs-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Ronald E. Raney, Shreveport, for defendants-appellees.
Before SEXTON, NORRIS and VICTORY, JJ.
SEXTON, Judge.
The plaintiffs, Eddie Mae Shaw, Janice Marie Toliver, Ruby Lee Shaw Petteway, Nathaniel Shaw, Jr., and Gerlene Shaw Phillips, the widow and adult children of Nathaniel Shaw, Sr., appeal the jury verdict denying their claims against the defendants, Eola B. Watson and her insurer, Fidelity & Casualty Company of New York,[1] for Mr. Shaw's wrongful death. Fidelity & Casualty has answered the appeal, seeking reversal of the trial court judgment holding it liable to the plaintiffs for $4000 pursuant to the medical payment provisions clause of Mrs. Watson's insurance policy. We affirm.
Nathaniel Shaw, Sr. was a self-employed house painter with over 35 years experience painting houses. At approximately 4:30 p.m. on January 5, 1982, Mr. Shaw came to the residence of his longtime customer, the defendant, Mrs. Watson, apparently at her request, to clean out her gutters and to give her an estimate on painting her house. After talking with Mrs. Watson, Mr. Shaw placed a 16-foot extension ladder against the gutters along the roof of her house with the bottom of the ladder on Mrs. Watson's concrete front porch. Mrs. Watson then reentered her house. At that time Mr. Shaw was four or five rungs up the ladder. Several minutes later, Louis Southall, who was doing yard work on the opposite side of Mrs. Watson's house, heard "the ladder make a tremendous noise" of metal scraping against metal. When Mr. Southall investigated the noise, Mr. Shaw was lying on the concrete porch with the ladder lying nearby. There was additionally a trashbag of pine needles on the porch. Mr. Shaw suffered head injuries in the fall and died 93 days later as a result of those injuries. There were no eyewitnesses to the accident and Mr. Shaw was never able to relate his version of the incident, so the specific details of the accident are mostly conjectural. Nathaniel Shaw, Jr., who viewed the scene of his father's accident two days later, noted that the portion of the roof closest to the chimney had been cleared of pine needles, suggesting to him that his father had begun cleaning the roof of pine needles prior to cleaning the gutters.
The plaintiffs filed a wrongful death action alleging both negligence and strict liability as grounds for recovery. A jury found no negligence on the part of Mrs. Watson and found that her property did *922 not create an unreasonable risk of injury to the decedent.
The trial court determined the applicability of the medical payment provisions of the insurance policy in favor of the plaintiffs and ordered Fidelity & Casualty to pay $4000 to the plaintiffs.[2] This decision involved an interpretation of a professional services exclusion in the policy. The trial court found that the decedent was not a professional gutter cleaner, that the cleaning of the gutters was not incidental to a painting job, and therefore the decedent was not rendering professional services at the time of the accident. The exclusion was thus found not to apply. A judgment encompassing both the jury and trial court findings was thereafter signed.

LIABILITY
The plaintiffs initially argue that the jury committed manifest error in failing to find Mrs. Watson guilty of negligence or strictly liable for the condition of her house. We disagree.
The owner of immovable property has a duty to keep such property in a reasonably safe condition. The owner must discover any unreasonably dangerous condition on the premises and either correct it or warn potential victims of its existence. Williams v. Exxon Corporation, 541 So.2d 910 (La.App. 1st Cir.1989), writ denied, 542 So.2d 1379 (La.1989); Carter v. Board of Supervisors of Louisiana State University, 459 So.2d 1263 (La.App. 1st Cir.1984), writ denied, 462 So.2d 1248 (La. 1985). Under either a negligence (LSA-C.C. Art. 2315) or a strict liability (LSA-C.C. Arts. 2317 and 2322) theory of recovery against the owner or custodian of immovable property, the plaintiff has the burden of proving: (1) that the defendant had custody of the property causing the damage; (2) that the property was defective because it had a condition that created an unreasonable risk of harm; and (3) that the defect was the cause in fact of the injury. Barnes v. New Hampshire Insurance Company, 573 So.2d 628 (La.App. 2d Cir. 1991); Waters v. McDaniel Recreation Center, Inc., 521 So.2d 788 (La.App. 2d Cir.1988), writ denied, 524 So.2d 520 (La. 1988). The difference between the two theories of liability is proof as to the defendant's knowledge. Under a negligence theory, the plaintiff must prove that the defendant knew or should have known of the unreasonable risk of harm posed by the property. Under a strict liability theory, the plaintiff is relieved of proving such knowledge. Barnes v. New Hampshire Insurance Company, supra; Waters v. McDaniel Recreation Center, Inc., supra.
Clearly Mrs. Watson, as owner of the property, had custody of the house where the accident occurred. Thus, the ultimate issue presented in the instant case, under either a negligence or strict liability theory, is whether the property was defective. The plaintiffs assert that various conditions combined to create an unreasonable risk of harm, rendering Mrs. Watson's property defective. The factors which plaintiffs contend combined to create an unreasonable risk of harm were the condition of: (1) the gutters, allegedly defective because they were not securely fastened to the fascia board and were full of pine needles and other debris; (2) the roof shingles, allegedly defective because they were old and brittle; (3) the concrete porch, allegedly defective because it was slippery; and (4) the roof itself, allegedly defective because of its steepness.
We conclude that all of these factors should have been readily apparent to the decedent, who had years of experience painting houses and using ladders and had apparently performed similar work at Mrs. Watson's house without incident several times in the past. The evidence revealed that the condition of the gutters could be determined from the ground. Nathaniel Shaw, Jr. noted that from the ground he could see the pine needles in the gutter and that the gutter was sagging away from the house; this observation was made only two to three days after his father's *923 accident. Additionally, the younger Shaw admitted that a defective condition of the gutter would be noted immediately by a person climbing a ladder which rested against such a gutter.
There was no evidence of any cracked or broken shingles on the roof, although Mr. Shaw, Jr. described the shingles as "old and crispy" (apparently a reference to granules inherent on shingles). However, Mr. Shaw, Jr. testified that he noticed these granules while still on the ladder. Additionally, Phillip Barron, the defendants' expert in general contracting, testified that these granules appear on every roof, more so on new roofs than on old ones.
The slickness of the concrete porch was, according to Mr. Barron, exacerbated because the concrete had been painted. Yet this factor, too, should have been determined from the ground. Finally, the steepness of the roof is readily apparent from the photograph of the house admitted into evidence.
In short, all of the allegedly defective conditions of the house should have been readily apparent to Mr. Shaw. Several of the defects should have been apparent to any layman and all should have been apparent to a man like Mr. Shaw, who had over 35 years experience in the field. Notwithstanding these readily apparent hazardous conditions, Mr. Shaw did not attempt to take any of the measures described as typical precautions by the witnesses at trial. Mr. Shaw did not stretch a rope across the roof to give himself something to hold; he did not use a second, secured ladder on the roof itself; he did not tie his ladder to a gutter spike or other secure feature on the house; he did not have someone hold the ladder or otherwise secure it at the bottom so it would not slide;[3] and he did not clean the roof from the ladder with a tree trimmer as his son eventually did.
Although a landowner owes a duty to discover unreasonably dangerous conditions on his premises, the landowner is not liable for an injury which results from a condition which should have been observed by the individual in the exercise of reasonable care or which was as obvious to the visitor as it was to the landowner. Barnes v. New Hampshire Insurance Company, supra; Spencer v. Magee, 563 So.2d 564 (La.App. 4th Cir.1990), writ denied, 567 So.2d 1123 (La.1990); Paul v. Commercial Union Insurance Company, 535 So.2d 1319 (La.App. 5th Cir.1988). Mrs. Watson and her insurer could not be held liable for the readily apparent conditions of her home, especially where these conditions should have been more obvious to Mr. Shaw than to Mrs. Watson. The jury verdict finding no liability appears correct and is surely not clearly wrong.

EVIDENCE
The plaintiffs assert that two evidentiary rulings by the trial court were erroneously made and require reversal of the judgment. First, pursuant to a motion in limine by the defendants, the trial court refused to allow any testimony that, subsequent to the accident, a portion of the gutters in the back of the house were repaired and/or replaced. As Mr. Shaw's accident occurred in the front of the house, the trial court ruled that any repair work done to the physically separate gutters in the rear of the house would be irrelevant.
Relevant evidence is that which tends to make the existence of any fact of consequence in the action more or less probable than it would be without such evidence. LSA-C.E. Art. 401. The trial court is granted much discretion in determining the relevancy of evidence. Arledge v. Bell, 463 So.2d 856 (La.App. 2d Cir.1985); Ketcher v. Illinois Central Gulf Railroad Company, 440 So.2d 805 (La.App. 1st Cir.1983), writs denied, 444 So.2d 1220, 1222 (La.1984). Of course, remedial measures are not admissible to prove negligence or culpable conduct. LSA-C.E. Art. 407; Toups v. Sears, Roebuck and Company, Inc., 507 So.2d 809 (La.1987).
*924 We do note that LSA-C.E. Art. 407 is not applicable if the theory of the case is some concept other than negligence or culpable conduct. In that circumstance, the balancing process described in Arts. 401 and 403 of the Code of Evidence is required. LSA-C.E. Art. 407, comment (b). It has been held in particular that the general rule of LSA-C.E. Art. 407 is inapplicable in strict product liability cases because remedial measures are relevant to establish what the manufacturer knew or should have known at the time of the injury. Toups v. Sears, Roebuck and Company, Inc., supra at 816, 817.
However, the evidence at issue is inadmissible with respect to negligence. LSA-C.E. Art. 407. Also, by definition, defendant's knowledge or lack thereof is irrelevant when dealing with strict liability. Barnes v. New Hampshire Insurance Company, supra; Waters v. McDaniel Recreation Center, Inc., supra. Moreover, there was no evidence presented that these gutters were of a similar type, age, and condition as those at the front of the house. The trial court, therefore, did not err in excluding this testimony.
The remaining evidentiary ruling of which the plaintiffs complain concerns the trial court's limitation of the testimony of Nathaniel Shaw, Jr. Plaintiffs' counsel attempted to elicit Mr. Shaw, Jr.'s opinion as to how his father's accident occurred. Defendants objected that the question sought an opinion outside Mr. Shaw, Jr.'s area of expertise. The trial court sustained the objection.
An offer of proof revealed the younger Shaw's opinion that his father was going onto the roof for a second time when he slipped stepping off the ladder due to the steepness of the roof and the brittleness of the shingles. Further, the younger Shaw opined that when his father attempted to reach back for the ladder, the gutter gave out on him and he fell off the roof.
An expert witness's opinion testimony should be limited to his actual field of expertise. Succession of Armshaw v. Succession of Marbury, 428 So.2d 1180 (La. App. 5th Cir.1983); Dickson v. State Farm Insurance Agency, 396 So.2d 514 (La.App. 3rd Cir.1981). Although Nathaniel Shaw, Jr. was accepted as an expert in house painting, the opinion given appears to have required expertise in the field of accident reconstruction.
Nevertheless, plaintiffs argue that the younger Shaw's testimony should have been allowed under LSA-C.E. Art. 701. Article 701 permits a lay witness to advance opinions which are rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. As a general rule, however, the opinion testimony of lay witnesses should be excluded. Montelbano v. Montelbano, 415 So.2d 303 (La.App. 2d Cir.1982), writ denied, 420 So.2d 163 (La.1982); Starks v. Kelly, 435 So.2d 552 (La.App. 1st Cir.1983). Additionally, the trial court is vested with broad discretion in administering Art. 701. LSA-C.E. Art. 701, comment (b).
Nathaniel Shaw, Jr.'s opinion as to how his father's accident occurred constitutes nothing more than pure speculation. The basis for Mr. Shaw, Jr.'s opinion was that it was his father's habit not to drop leaves from the roof but to take them down the ladder and then return to repeat the process. It seems obvious that even if it was the deceased's habit to always return down the ladder rather than dropping full bags of leaves from the roof, the accident could have happened in any one of three different ways.
The deceased could have slipped as he was descending the roof with the first bag of leaves to mount the ladder and have hit the ladder in the process, resulting in his fall as well as that of the leaves and the ladder. It also seems possible that the deceased could have slipped in the process of getting on the ladder to descend with the leaves (or while already on the ladder in this process), again causing the deceased, the ladder, and the leaves to fall to the ground. Finally, it seems just as plausible the accident occurred as Mr. Shaw, Jr. suggests, i.e., as Mr. Shaw was ascending the ladder after having deposited the leaves on the ground.
*925 Most importantly, however, we are unable to discern how this evidence could affect the result. The asserted defects on the premises are still present and are as obvious as ever. Moreover, even assuming the trial court erred in either or both of these evidentiary rulings, any error was harmless and does not merit reversal. When the review of the record clearly indicates that the trial court judgment is correct and that justice has been done, that judgment will not be overturned because of an error which did not affect the merits. Shows v. Williamson, 256 So.2d 688 (La. App. 2d Cir.1972), writ refused, 261 La. 231, 259 So.2d 76 (1972); Johnson v. Morris, 431 So.2d 429 (La.App. 4th Cir.1983) (on application for rehearing), writ denied, 437 So.2d 1151 (La.1983). In light of the clear evidence of the obvious nature of any defects, discussed supra, evidence of repairs to the back gutters and Nathaniel Shaw, Jr.'s opinion as to how the accident occurred could not have affected the outcome of the case. This evidence did not concern the obvious nature of the defects and any error in withholding the evidence would not have affected the finding of a lack of negligence or strict liability on the part of the defendants.

INSURANCE
Each side asserts error in the trial court's interpretation of the medical payment provisions of Mrs. Watson's insurance policy. The plaintiffs argue that Mr. Shaw, Sr. should be considered an insured under the insurance policy. They therefore urge that Fidelity & Casualty is liable for penalties and attorneys fees for its arbitrary and capricious failure to timely pay full insurance coverage to an insured.
Clearly, however, Mr. Shaw, Sr. did not qualify as an insured. Under the terms of the insurance policy, an insured is defined, for purposes of the medical payment provision, as, in pertinent part: "the named insured (Mrs. Watson) and, if residents of the named insured's (Mrs. Watson's) household, his spouse, the relatives of either, and any other person under the age of twenty-one in the care of an insured...." Clearly, Mr. Shaw was not an insured and the plaintiffs are not entitled to penalties and attorney fees. LSA-R.S. 22:658; Spivey v. Super Valu, 575 So.2d 876 (La.App. 2d Cir.1991).
The remaining issue involves an interpretation of a professional services exclusion under the medical payment provision of Mrs. Watson's insurance policy. The policy insures medical payments for persons who sustain bodily injury from an accident while on the insured premises with the permission of Mrs. Watson. The policy, however, does not apply to bodily injury to "any person while on the insured premises because a business is conducted or professional services are rendered thereon." The exclusion was found not to apply and Fidelity & Casualty was ordered to pay the plaintiffs $4000 in medical payments. Fidelity & Casualty's answer to the appeal seeks review of this portion of the judgment.
We note at the outset that the burden is on the insurer to prove that an exclusion in an insurance policy is applicable. United States Fire Insurance Company v. West Monroe Charter Service, Inc., 504 So.2d 93 (La.App. 2d Cir.1987), writ denied, 505 So.2d 1141 (La.1987); Hampton v. Lincoln National Life Insurance Company, 445 So.2d 110 (La.App. 2d Cir.1984).
The trial court, in making its decision, focused on the occupation of the decedent. As the accident occurred while Mr. Shaw was cleaning the gutters (and/or the roof), the accident did not occur while Mr. Shaw was engaged in his profession, painting.
Although the policy itself does not define "professional services," we note that the phrase has been cogently defined as follows by the First Circuit Court of Appeal:
Professional services, in its usual connotation, means services performed by one in the ordinary course of the practice of his profession, on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due.
*926 Aker v. Sabatier, 200 So.2d 94, 97 (La.App. 1st Cir.1967), writs denied, 251 La. 48, 49, 202 So.2d 657, 658 (1967). Such a definition would lend credence to Fidelity & Casualty's argument that Mr. Shaw was rendering professional services at the time of the accident.
The policy can be read as Fidelity & Casualty proposes, i.e., with the primary focus on the activity of Mr. Shaw. However, reading the entire clause, it would be as reasonable to assume that the focus of the clause is on the homeowner's activity, rather than the activity of the injured person. The phrase "professional services" can reasonably be read to complement and accordingly expand the preceding reference in the clause to "business." Under such a reading, the entire clause would be concerned with small enterprises such as hair salons, produce stands, and other small businesses or professional services that might be rendered by a homeowner on the premises. There is no evidence in the instant case that Mrs. Watson was conducting any business or professional service at her residence.
It is well-settled that any ambiguity in an insurance policy must be interpreted against an insurer. Pareti v. Sentry Indemnity Company, 536 So.2d 417 (La. 1988); Credeur v. Luke, 368 So.2d 1030 (La.1979). As we find that the language in the exclusion at issue is ambiguous, we must find that the exclusion is not applicable and the trial court correctly awarded the plaintiffs the $4,000 limits of the medical payment provision of the policy.
For the above and foregoing reasons, the trial court judgment is affirmed at plaintiffs-appellants' cost.
AFFIRMED.
NOTES
[1] The insurer was erroneously cited as Fidelity & Casualty Insurance Company.
[2] The defendants' brief states that the medical payment issue was inadvertently not sent to the jury. The parties apparently agreed that the trial court would decide this issue.
[3] While the point is not clear, it appears from Mr. Shaw, Jr.'s testimony the bottom of the ladder was not equipped with a slide prevention device.