776 So.2d 1 (2000)
Denny Raymond FROMENTHAL and Carol Jean Fromenthal, Wife of Denny Raymond Fromenthal
v.
DELTA WELLS SURVEYORS, INC.
No. 98-CA-1525.
Court of Appeal of Louisiana, Fourth Circuit.
October 4, 2000.
Opinion Granting Rehearing December 20, 2000.
Writ Denied March 16, 2001.
*2 John M. Holahan, Metairie, Counsel for Plaintiffs/Appellants.
Daniel E. Knowles III, Brien J. Fricke, Burke & Mayer, New Orleans, Counsel for Defendant/Appellee.
(Court composed of Judge WILLIAM H. BYRNES, III, Judge STEVEN R. PLOTKIN, Judge MIRIAM WALTZER, Judge JAMES F. McKAY, Judge DENNIS R. BAGNERIS, Sr.)
*3 PLOTKIN, Judge.
Plaintiffs Denny Raymond and Carol Jean Fromenthal appeal a trial court judgment on a jury verdict awarding them $65,808.53 in damages and assigning 73 percent comparative fault to Mr. Fromenthal for injuries incurred when he fell off a ladder while leaving a barge at a marine facility owned and operated by defendant Delta Well Surveyors, Inc. For the reasons explained below, we vacate the lower court judgment, and perform a de novo review. Following our review, we assign liability 50 percent to Mr. Fromenthal and 50 percent to Delta Well. Moreover, we award the Fromenthals a total of $444,724.19 in damages.

I. FACTS
Mr. Fromenthal suffered a fractured right hip on September 23, 1994, when he fell from an aluminum ladder while performing a sales call on Delta Well premises. Mr. Fromenthal testified that he arrived on the premises of Delta Well sometime after noon and parked in the parking lot. Mr. Fromenthal, who was a diesel mechanic, regularly visited the premises as a part of his employment duties for Eckstein Marine; he was seeking contract work. E.J. Adolph, Delta Well's mechanic was his contact at Delta Well; he had been told on his first visit to Delta Well some six to eight weeks before the accident that Mr. Adolph was the only person who would know if contract mechanic work was available. Mr. Fromenthal had been visiting Delta Well approximately once a weekusually on Thursday or Fridaysince his first visit; he always talked to Mr. Adolph. In fact, he had previously received work from Delta Well through Mr. Adolph. The record contains two invoices from Detroit Specialists Corp., Eckstein Marine's subsidiary, to Delta Wellone for repair of a blower dated August 26, 1994, and one for various types of work on a head, cam shafts, and injectors, dated August 11, 1994.
Once Mr. Fromenthal arrived on the premises on the day of the accident, someone in the office informed him that Mr. Adolph was working on board a vessel, the M/V Able Queen. Mr. Fromenthal proceeded to that vessel and climbed a ladder that was leaning against the side of the vessel; the vessel was a jack-up barge that was elevated approximately 12 to 15 feet at the time that Mr. Fromenthal arrived. Once he reached the deck, Mr. Fromenthal found Mr. Adolph, who was working below deck inside the hull of the barge, and discussed business with him. He then proceeded to climb down the ladder. While he was descending the ladder, it slid on the concrete deck, causing him to fall into the adjacent bayou. As a result of his fall, Mr. Fromenthal underwent emergency surgery requiring the placement of five pins to stabilize his fractured right hip. At the time of trial in February 1997, Mr. Fromenthal had not returned to work. As explained in more detail below, the parties gave conflicting versions of other facts concerning the events surrounding the accident.
A four-day trial on the matter was held before a jury, after which the jury returned a verdict awarding the Fromenthals a total of $65,808.53. Moreover, the jury apportioned fault 73 percent to Mr. Fromenthal and 27 percent to Delta Well. The Fromenthals appeal, setting forth a number of legal and procedural errors, and seeking review of both the liability findings and the quantum award.

II. LEGAL AND PROCEDURAL ERRORS
The Fromenthals claim that the trial court made the following legal and procedural errors: (1) failing to allow testimony from their proffered expert in marine operations, (2) allowing repeated references to Mr. Fromenthal's workers' compensation claim in violation of La. C.E. art. 414, (3) removing the owner of the barge, P & S Well Service, Inc., from the jury interrogatories, and (4) failing to transcribe the voir dire of the jury, as well as other *4 significant portions of the trial court proceedings. This court has previously found as follows:
[T]he cumulation of trial judge errors in evidentiary rulings, coupled with other improper circumstances occurring at trial, may be so prejudicial as to deprive the parties of a fair trial, and thus may constitute reversible error, even if none of the errors considered alone would be sufficient to rise to the level of reversible error.
Dixon v. Winn-Dixie Louisiana, Inc., 93-1627, p. 3 (La.App. 4 Cir. 5/17/94), 638 So.2d 306, 312, citing Clement v. Griffin, 91-1664 (La.App. 4 Cir. 5/17/94), 634 So.2d 412, writs denied, 94-0717, 94-0777, 94-0789, 94-0791, 94-0799, 94-0800 (La.5/20/94), 637 So.2d 478, 479. Thus, we will consider whether the legal and procedural errors alleged by the Fromenthals demand de novo review of the record in this case.

A. Exclusion of Commander Cole's testimony
The Louisiana Third Circuit Court of Appeal has held as follows:
Generally, an appellate court is precluded from reviewing a jury's finding of fact in the absence of manifest or clear error. However, when a trial court erroneously instructs the jury in law, or makes a consequential error in the exclusion of evidence, the trial court judgment which implements the jury verdict should not be accorded any weight. When an appellate court has all of the facts before it in such situations, it has the constitutional duty to review questions of law as well as facts presented and should render judgment on the record.
Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144, 152 (La.App. 3 Cir.1990), writ denied, 561 So.2d 144 (La.App. 3d Cir. 1990), citing McLean v. Hunter, 495 So.2d 1298 (La.1986) (citations omitted; emphasis added). The McLean and Jaffarzad cases are particularly instructive in our review of the instant case because the courts found in both cases that a trial court's exclusion of expert testimony so prejudiced the jury's verdict that "judgment on the record" (or de novo review) was appropriate. In the instant case, the only expert testimony concerning marine operations offered by any party was the testimony of retired Coast Guard Commander David E. Cole, which was offered by the Fromenthals. Thus, we will first consider whether the trial court properly excluded Commander Cole's testimony, and, if so, whether the exclusion of that evidence was prejudicial to the Fromenthals.
Following an initial period of questioning of Commander Cole outside the presence of the jury, Delta Well objected to the admission of his testimony by characterizing the case as one "about authorization to board a vessel, permission to board a vessel, and a simple climbing of a ladder to board a vessel" and by asserting that "there's no scientific or technical knowledge required." In excluding Commander Cole's testimony, the trial court stated as follows:
I find the Commander is a credible person. I have, I don't think there was objection passed when he testified. This is the first time this objection has been raised. I feel constrained to sustain the objection. I am going to charge the jury with the standard. Now I expect you to prepare that for me. I will charge them because I think that is more in the area of law that deals with the art of the statement of law than it is a statement of fact. I will make this testimony outside the presence of the jury a proffer for the record. If you have anything else to put on the proffer at this time I'll let you do that.
On appeal, the Fromenthals assert that, contrary to Delta Well's objection at trial, they laid an adequate foundation for Commander Cole's testimony by showing that marine facilities and operators, like Delta Well, are required to possess specialized *5 knowledge of particular regulations and standards. On appeal, Delta Well continues to assert that Commander Cole's testimony would not have assisted the jury in determining any fact at issue in the litigation.
Under Louisiana law, the admission of expert witness testimony is controlled by La. C.E. art 702, which provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The trial court expressly found that Commander Cole was credible. Moreover, the record supports the Fromenthals' assertion that Commander Cole possessed specialized knowledge concerning the regulations and standards applicable to marine operations, like Delta Well. Commander Cole stated that he performed marine inspections for 18 years while he was a member of the Coast Guard. He described the duties of a marine inspector as follows: "[I]nspecting vessels to determine if they comply with the appropriate rules and regulations that apply to them and consist of the licensing of merchant marine personnel." Commander Cole also stated that he received training in ladder safety through various service schools and that he had investigated many ladder accidents.
On appeal, Delta Well claims that the exclusion of Commander Cole's testimony was proper for three reasons: (1) the issues presented by the case "required no scientific or technical knowledge," (2) Commander Cole intended to testify concerning an "ultimate issue" in the case, and (3) Commander Cole's proffered testimony was not admissible under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
First, Delta Well claims as follows: "It was the intention of the plaintiff to introduce the testimony of Cole as `authority' on very simple issues such as whether a tied ladder is more secure than an untied ladder and how to climb a ladder." However, the proffer of Commander Cole's testimony indicates that his testimony would have addressed a number of other issues, such as the following: (1) the substance of OSHA and ANSI standards applicable to marine operations, (2) whether Delta Well violated any of those regulations, and (3) whether those violations contributed to Mr. Fromenthal's accident and injury.
Second, Delta Well complains that Commander Cole's might have suggested that Delta Well was liable in this case for its failure to comply with OSHA and ANSI standards. However, the fact that Commander Cole's testimony might have addressed an ultimate issue in the case is not grounds for objection. La. C.E. art. 704, relative to expert opinion on an ultimate issue, expressly provides, in pertinent part, as follows:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.
(Emphasis added.)
Third, Delta Well claims that Commander Cole's testimony was properly excluded under the standards enunciated by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993). We disagree. Our review of the proffer reveals no reason to question either the scientific reliability of the testimony or the reasoning or methodology underlying the testimony. Moreover, the testimony does not involve scientific experimentation; therefore, neither the known or potential rate of failure, the existence of standards controlling the technique's operation, the technique's "reputability" *6 or testability, or general acceptance in the scientific community are a concern. Commander Cole's proposed testimony is not scientific; rather, it is purely technical. Nothing in the record indicates that Commander Cole's proposed testimony violated the principles established by Daubert.
Moreover, the exclusion of Commander Cole's testimony in this case was unquestionably prejudicial to the Fromenthals. As previously noted, Commander Cole's testimony was in fact the only expert testimony offered in this case. Additionally, review of the proffer reveals that Commander Cole intended to testify concerning OSHA and ANSI regulations and standards applicable to all marine operations, including Delta Well. No other witness testified to those standards; thus, the jury did not hear any evidence concerning the existence of the standards and regulations. Such evidence is relevant to this case, which the Fromenthals claim involves an injury caused by violation of those exact standards and regulations. Accordingly, we find that the trial court's exclusion of this evidence was prejudicial to the Fromenthals' case. Moreover, under the rule enunciated in McLean and Jaffarzad, de novo review is appropriate solely because of this "consequential error in the exclusion of evidence." Jaffarzad, 561 so.2d at 152.

B. References to worker's compensation case
Our conclusion that de novo review is appropriate in this case is further supported by the fact that the record reveals that the trial court allowed repeated references to Mr. Fromenthal's workers' compensation claim, in violation of La. C.E. art. 414, which provides as follows:
Evidence of the nature and extent of a worker's compensation claim or of payment of past or future worker's compensation benefits shall not be admissible to a jury, directly or indirectly, in any civil proceedings with respect to a claim for damages relative to the same injury for which the worker's compensation benefits are claimed or paid. Such evidence shall be admissible and presented to the judge only.
The Fromenthals claim that Delta Well's attorney repeatedly referred to Mr. Fromenthal's workers' compensation claim. Our review of the record indicates that the workers' compensation issue was directly introduced by Delta Well's attorney when he asked Mr. Fromenthal the following question: "The question was, is there going to come a time when your compensation benefits run out, do you know?" Moreover, Delta Well's attorney made several references to the "State's" report during its questioning of Mr. Fromenthal. Delta Well argues that the Fromenthals' attorney also asked questions concerning the workers' compensation issue, implying that those questions should prevent the Fromenthals from raising the issue on appeal. However, the record clearly reveals that the references made by the Fromenthals' attorney came after the introduction of the issue by Delta Well's attorney and that they were designed to explain testimony already elicited by Delta Well's attorney. The admission of this improper evidence also provides support for our decision to perform a de novo review of this case.

C. Other legal and procedural errors
Because the trial court's exclusion of the expert testimony of Commander Cole, especially when coupled with the admission of testimony concerning Mr. Fromenthal's workers' compensation suit, requires de novo review of the trial court record in this case, we pretermit discussion of the other two alleged legal and evidentiary errors committed by the trial judge. We hereby vacate the trial court judgment on liability, and perform a de novo review of the record evidence.

III. LIABILITY
Like a trial court, an appellate court performing a de novo review in a case involving competing allegations of liability *7 must consider two issues: (1) the defendant's liability; and (2) the plaintiff's comparative liability.

A. Delta Well
The most recent decision of the Louisiana Supreme Court considering the liability of a landowner for injuries caused by a dangerous condition on his property is Pitre v. Louisiana Tech University, 95-1466, 95-1487 (La.5/10/96), 673 So.2d 585, writ denied, 95-1466 (La.5/10/96), 673 So.2d 585. Under the principles enunciated in Pitre, the liability of a landowner is governed by La. C.C. arts. 2315 and 2316, "which make all persons responsible for damages caused by their `negligence.'" Id. at 8, 673 So.2d at 589. The analysis adopted by Louisiana courts to determine whether liability exists under La. C.C. arts. 2315 and 2316 is called the "duty/risk analysis." Id.; Howard v. Derokey, 98-0893 (La.App. 4 Cir. 2/10/99), 729 So.2d 654, 656. In order to determine liability under the duty/risk analysis, a court must consider the following "relevant inquiries":
(1) Was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Whether the requisite duties were breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
(5) Were actual damages sustained?
Pitre at 8, 673 So.2d at 589-90.
The Fromenthals claim that Delta Well is liable for Mr. Fromenthals' accident and injury for two reasons: (1) failure to secure the ladder by properly tying it off after setting it up, and (2) failure to warn or protect Mr. Fromenthal of the dangerous condition presented by the unsecured ladder. We will analyze each of those claims under the duty-risk analysis.

1. Failure to secure ladder
First, the Fromenthals claim that Delta Well is liable for Mr. Fromenthal's accident and injury because it failed to secure the ladder safe by properly tying it off after setting it up.

a. Cause in fact
Under Pitre, the first question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to secure the ladder by tying it off is whether that failure was a cause in fact of the accident and injury. That question is easily answered in the affirmative because the record evidence clearly reveals that a ladder that is properly tied off will not fall, even if it slips. Tom Danley, Delta Well's port captain, testified that he had climbed on ladders that had started to slip, but did not fall because they were tied off. Thus, we find that Delta Well's failure to tie off the ladder was a cause-in-fact of Mr. Fromenthal's injuries.

b. Duty to secure ladder
The second question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to secure the ladder by properly tying it off is whether Delta Well had a duty to secure the ladder by properly tying it off. Relative to that question, Commander Cole testified that both OSHA regulations and ANSI regulations require marine facilities to provide an adequate means for getting on and off a vessel. When a ladder is used, Commander Cole stated, it must be secured, meaning that the ladder should be tied at the top and the bottom to prevent slippage. Commander Cole also indicated that ladders should have slip-resistant footings for the same reason. Marine facilities, such as Delta Well, should be aware of those regulations, Commander Cole stated. Moreover, Delta Well's employees admitted that the ladder should have been tied off if anyone was climbing on it. Accordingly, *8 we find that Delta Well had a duty to properly tie off the ladder.

c. Breach of duty to tie off the ladder
It is undisputed that the ladder in question was neither tied off nor fitted with slip-resistant footings at the time of Mr. Fromenthal's accident and injury. Delta Well claims however that the failure to tie the ladder off at the time of Mr. Fromenthal's accident was not a breach of duty because of the circumstances surrounding their decision not to tie it off. Because the vessel had been jacked up and down several times on the day in question, Delta Well claims that it was impractical to tie and untie the ladder every time the vessel was moved. Delta Well claims that the duty to secure the ladder applies only when someone is actually climbing on the ladder and that its employees knew that they should tie off the ladder prior to climbing on it. However, as discussed in more detail below, under the circumstances presented by this case, Delta Well allowed access to the ladder to a person who did not know that he needed to tie off the ladder prior to climbing on it. Accordingly, we find that Delta Well breached its duty to properly tie off the ladder.

d. Scope of protection
The fourth question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to secure the ladder by properly tying it off is whether the risk and the harm caused were within the scope of protection afforded by Delta Well's duty to secure the ladder by tying it off. Like the cause-in-fact, question, this question is easily answered in the affirmative. The risk that Mr. Fromenthal would fall from the ladder and the harm that he would be injured in that fall are squarely within the scope of protection afforded by a duty to secure the ladder by tying it off.

e. Damages
The fifth, and final, question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to secure the ladder by tying it off is whether Mr. Fromenthal sustained actual damages as a result of Delta Well's breach of that duty. As discussed above, and in more detail in the "Damages" section below, Mr. Fromenthal suffered a fractured right femur, requiring emergency surgery and other circumstances. Thus, we find that Mr. Fromenthal did sustain actual damages as a result of Delta Well's breach of its duty to secure the ladder by tying it off.

2. Failure to warn or protect
Second, the Fromenthals claim that Delta Well is liable for Mr. Fromenthal's accident and injury because it failed to either warn Mr. Fromenthal of the danger of climbing on the unsecured ladder or protect him from the danger by preventing him from climbing on it.

a. Cause in fact
The first question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to warn or protect is whether that failure was a cause in fact of the injury. The record evidence is clear that neither the accident nor the injury would have occurred had Mr. Fromenthal not climbed on the ladder in question. Moreover, nothing in the record suggests that Mr. Fromenthal would not have heeded any warnings given by Delta Well employees concerning the dangerous nature of the ladder. Accordingly, we find that Delta Well's failure to warn or protect was a cause-in-law of Mr. Fromenthal's accident and injury.

b. Duty to warn or protect
The second question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to warn or protect is whether Delta Well had a duty to warn or protect Mr. Fromenthal of the dangerous condition of the unsecured ladder. Concerning a landowner's duties, the court stated as follows in Pitre: "A landowner owes a plaintiff a duty to discover *9 any unreasonably dangerous condition and to either correct the condition or warn of its existence." Id. at 9, 673 So.2d at 590. In the instant case, there is no real question that the danger presented by climbing an unsecured ladder leaning against a marine vessel and resting upon a concrete deck was unreasonable.
Moreover, Delta Well acknowledged the existence of the duty to warn and protect. Dwayne Briggs, Delta Well's vice-president, testified that all Delta Well employees were considered responsible for the safety of visitors on the premises, and that any employee seeing an unauthorized person about to climb on a ladder had a duty to stop the person. The question of authority to be on the premises was to be decided on a case-by-case basis, Mr. Briggs stated. Thus, we find that Delta Well did have a duty to warn or protect Mr. Fromenthal from the danger presented by the unsecured ladder.

c. Breach of duty
The second question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to warn or protect is whether Delta Well breached that duty. Relative to that question, both Mr. Briggs and Mr. Danley stated that they saw Mr. Fromenthal on the premises the day of the accident. In fact, Mr. Briggs admitted that Mr. Fromenthal came into the office just prior to the accident, asking about Mr. Adolph's whereabouts, while Mr. Danley said that he saw Mr. Fromenthal on the premises, walking toward the vessel, as close as 30 to 40 feet away. Both men stated that they recognized Mr. Fromenthal and knew that he was looking for Mr. Adolph, because Mr. Adolph was his contact. Both Mr. Briggs and Mr. Danley also knew that Mr. Adolph was working on the M/V Able Queen at the time. In fact, Mr. Danley said could see Mr. Adolph's head sticking up from the "hole" at the time he saw Mr. Fromenthal headed in that direction.
Nevertheless, neither Mr. Briggs nor Mr. Danley warned Mr. Fromenthal that he should not climb on the ladder in order to access the M/V Able Queen. Mr. Briggs stated that he assumed that Mr. Fromenthal would simply leave the premises once he learned that Mr. Adolph was on board a vessel and therefore unavailable. Moreover, after Mr. Fromenthal completed his business with Mr. Adolph, neither Mr. Adolph nor his co-worker on the vessel, Henry Kramer, warned Mr. Fromenthal concerning the dangerous condition of the ladder before Mr. Fromenthal started his descent.
Delta Well claims however that its employees did not need to warn Mr. Fromenthal directly because numerous signs were posted around the premises forbidding trespassing and restricting access to certain areas, including the dock where the M/V Able Queen was being repaired, to authorized personnel. Mr. Fromenthal admitted at trial that no one gave him express permission to climb the ladder or to go aboard the M/V Able Queen; however, he also testified that he did not notice the signs. Moreover, Mr. Briggs admitted both that Mr. Fromenthal had been authorized to enter the premises to talk to Mr. Adolph and that he had on previous occasions been allowed to enter some of the restricted areas posted with the signs. Under the circumstances, we find that Delta Well breached its duty to warn or protect Mr. Fromenthal from the dangerous condition of the ladder.

d. Scope of protection
The fourth question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to warn or protect is whether the risk and the harm caused was within the scope of protection afforded by Delta Well's duty to warn or protect. Obviously, both the risk and the harm were within the scope of protection afforded by that duty. The risk that Mr. Fromenthal would fall from the ladder and the harm that he would be injured in that *10 fall are squarely within the scope of protection afforded by a duty to warn of or protect against the dangerous condition of an unsecured ladder.

e. Damages
The fifth, and final, question to be answered in order to determine whether Delta Well is liable for Mr. Fromenthal's accident and injury because of its failure to warn or protect is whether Mr. Fromenthal sustained actual damages as a result of Delta Well's breach of that duty. As stated above and explained in more detail below, Mr. Fromenthal suffered a fractured right femur, requiring emergency surgery and other circumstances. Thus, Mr. Fromenthal did sustain actual damages as a result of Delta Well's breach of its duty to warn or protect.

3. Result of duty/risk analysis
As revealed by the above analysis, Delta Well is legally liable to the Fromenthals for the accident and injuries sustained by Mr. Fromenthal both on the basis of its failure to warn or protect Mr. Fromenthal from the dangerous condition of the ladder and on the basis of its failure to tie off the ladder. In fact, it is the breach of both those duties at the same time which makes the actions of Delta Well so egregious in the instant case. Had Delta Well fulfilled either of those duties, the accident would not have occurred and Mr. Fromenthal would not have been injured, even if Delta Well had breached the other duty.
In its brief to this court, Delta Well cites Shipley v. Shipley, 30,283 (La.App. 2 Cir. 2/25/98), 709 So.2d 901, and Shaw v. Fidelity & Casualty Insurance Co., 582 So.2d 919 (La.App. 2 Cir.1991), as authority for relieving it of all or most of the liability for Mr. Fromenthal's accident. In both those cases, the court found that landowners were not responsible for injuries incurred when the plaintiffs fell from ladders located on their premises. However, both Shipley and Shaw are factually distinguishable from the instant case because of one very important factnothing in either case indicates that the defendant landowner set up the unsecured ladder in the location where the fall occurred. In fact, the Shaw case indicates that the plaintiff himself set up the ladder. 582 So.2d at 921. The Shipley case does not identify the person who set up the ladder, but indicates that it was not the defendant landowner. In the instant case, the record is clear that the ladder had been set up by Delta Well's employees. Accordingly, we find no merit in Delta Well's arguments based on Shaw and Shipley.

B. Mr. Fromenthal
Having determined that Delta Well is legally liable for Mr. Fromenthal's accident and injury on the basis of the duty/ risk analysis, we now turn to the comparative liability of Mr. Fromenthal. The comparative fault of a plaintiff in a tort action is governed by La. C.C. art. 2323, which states, in pertinent part, as follows:
If a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of another person or person, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
Id. at 974, applied recently by this court in Guerra v. White, 97-2391 (La.App. 4 Cir. 6/16/99), 755 So.2d 894.
Delta Well claims that Mr. Fromenthal should be held liable for his own injuries under the facts of this case because of the following circumstances: (1) he ventured into a restricted area without authorization, (2) he failed to tie off the ladder prior to climbing on it, (3) he climbed the ladder improperly, and (4) he did not need to climb the ladder in order to converse with Mr. Adolph.
Concerning Delta Well's first claim, the testimony elicited at trial indicates that numerous signs were posted on Delta Well's premises forbidding trespassing and restricting certain areas of the premises to authorized personnel. Mr. Briggs stated *11 that the signs had successfully prevented accidents prior to Mr. Fromenthal's fall. Mr. Fromenthal admitted at trial that no one gave him permission to climb the ladder or to go aboard the M/V Able Queen. However, as noted above, Mr. Fromenthal testified that he did not notice the signs. Moreover, Mr. Briggs admitted that Mr. Fromenthal had been authorized to enter the premises to talk to Mr. Adolph and that he had on previous occasions been allowed to enter some of the restricted areas.
Concerning Delta Well's second claim, the evidence indicates that Delta Well's employees routinely tied off the ladder prior to climbing on it. Mr. Fromenthal stated at trial that some pieces of rope had been attached to the ladder; he described them as "a messed up tangled up piece of a rope, all wadded up." Mr. Fromenthal stated that he did not notice whether the ladder was tied up before climbing on it. He said that he assumed that the ladder was safe because he knew that Mr. Adolph was on the boat, and he thought that he had climbed up that ladder.
Concerning Delta Well's third claim, Delta Well theorizes that the only reasonable explanation for the accident is found in its theory that Mr. Fromenthal placed too much weight on the portion of the ladder sticking up above the ship railing. When Mr. Fromenthal "overloaded" the top of the ladder, the ship railing functioned like a fulcrum, which in turn caused the bottom of the ladder to slide away from the boat and fall on the concrete dock. However, Mr. Fromenthal testified at trial that he climbed the ladder in exactly the same way as Delta Well's employees were climbing in pictures introduced at trial. Moreover, Delta Well's theory concerning the only reasonable explanation for the accident is pure speculation, not supported by record evidence.
Concerning Delta Well's fourth claim, Delta Well's port captain, Tom Danley, testified that he had conversed with Mr. Adolph from the safety of the dock on several occasions on the day of the accident. Moreover, when asked a direct question at trial, Mr. Fromenthal admitted that nothing prevented him from calling to Mr. Adolph from the dock. However, Mr. Fromenthal asserted, Mr. Adolph might not have heard him.
The factors to be considered by appellate courts to determine the allocation of fault to a plaintiff were established as follows in Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985):
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Applying the Watson factors to Mr. Fromenthal's actions in the instant case, we find that Mr. Fromenthal should be assigned 50 percent of the liability for causing his own accident and injury. First, it appears that Mr. Fromenthal's conduct was inadvertent, and did not involve an awareness of the danger. Second, his conduct created a great risk of danger since he was unfamiliar with the ladder he chose to climb on without investigating whether it was secure. Third, the consideration for Mr. Fromenthal's decision to climb the ladder was to seek contract work for his employer, which is a fairly significant consideration. Fourth, Mr. Fromenthal's capacity for making the ladder safe was inferior to Delta Well's capacity; however, his capacity for avoiding the danger presented by the ladder was superior to Delta Well's capacity. Fifth, the record indicates no *12 circumstances that required Mr. Fromenthal to proceed in haste, without proper thought or concern for his safety.
Accordingly, we apportion the fault for Mr. Fromenthal's accident 50 percent to Mr. Fromenthal and 50 percent to Delta Well.

IV. DAMAGES
Like the liability issue, the damages suffered by the Fromenthals must be determined by this court on the record before us. In Jones v. Hyatt Corp., 94-2194 (La. App. 4 Cir. 7/26/95), 681 So.2d 381, this court performed a de novo review of damages in a case involving an improper jury instruction, stating as follows: "we cannot say that the erroneous jury charge did not prejudice the amount of damages awarded by the jury." Id. at 7, 681 So.2d at 393. In the instant case, we are presented with an even stronger reason for performing a de novo review of the damages because the amount of the damages awarded by the jury, viewed in light of the record evidence, clearly reveals the prejudice to the jury caused by the trial court's legal and procedural errors. Accordingly, as in Jones, we vacate the trial court award on damages and assess the damages based on the record before us.

A. General damages
Because general damages do not have a common denominator, courts are to award them on a case by case basis. Williams v. Golden, 95-2712, p. 20 (La. App. 4 Cir. 7/23/97), 699 So.2d 102, 113, writ denied, 97-2788 (La.1/30/98), 709 So.2d 708. General damage awards are designed to compensate an injured plaintiff for the following factors: physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors that affect a victim's life. Id. The severity and duration are to be considered by courts assessing quantum for pain and suffering. Id.
In the instant case, Mr. Fromenthal, who was 55 years old at the time of the accident, testified that he was experiencing pain at the time he was pulled out of the bayou by Delta Well's employees immediately after the accident. Although he allowed the Delta Well's employees to take care of some of his minor injuries, he did not allow them to look at his hip. Instead, he returned to his company truck and drove from Delta Well's premises in Plaquemines Parish to Eckstein Marine's office in Jefferson Parish. Once he reached his office, his son, Steve, who was also an employee of Eckstein Marine, and some other mechanics helped him move from the company truck to his personal truck. From Eckstein Marine, Mr. Fromenthal passed by his house to pick up his wife, then went straight to the emergency room at East Jefferson General Hospital, by which time the pain was so severe that several people were required to get him out of the truck.
Once in the emergency room, x-rays taken revealed that Mr. Fromenthal had suffered a subcapital fracture of the right hip. He was examined by Dr. Gordon P. Nutik, who diagnosed a small cut on his right elbow, a small abrasion on the outside of his right ankle, hip pain, and slight external rotation of the right hip. Dr. Nutik testified at trial by video deposition that Mr. Fromenthal's hip fracture was apparent, and that the x-rays revealed a displacement of the fracture, indicated by a loss of position and some possible rotational changes. His major concern after examining Mr. Fromenthal and reviewing the x-ray was maintaining the bone in a way that would give Mr. Fromenthal the longest service from the joint. Other concerns arose from the possibility that the hip joint might develop arthritis and from the fact that Mr. Fromenthal was a diabetic, meaning he had a higher than average chance of infection. Dr. Nutik discussed several treatment options with the Fromenthals, warning him that he might be required to perform a hip-joint replacement during surgery to repair the hip fracture.
*13 Mr. Fromenthal underwent surgery the morning after the accident. Although a hip-joint replacement was not necessary, the surgery did require the placement of five canulated screws. Moreover, Dr. Nutik advised the Fromenthals after the surgery that a hip-joint replacement might still prove necessary within two years of the original surgery because of the possibility that Mr. Fromenthal might develop arthritis or infection at the site of the fracture. After one week in the hospital, Mr. Fromenthal was released, with instructions that he walk only with the aid of a walker.
Over a period of about four months after the accident and injury, Mr. Fromenthal progressed from walking with the walker to a cane and finally to walking without assistance, but with a slight limp that he still possessed at the time of the trial in this case, some two and one-half years after the accident and injury. Mr. Fromenthal underwent months of physical therapy, but had problems with some of the exercises because of pain in his right hip. Mr. Fromenthal testified that over the first six-month period after the accident, he had to learn to do a lot of things, like getting out of bed, in a different way.
When he saw Dr. Nutik on August 31, 1995, Mr. Fromenthal complained for the first time of lower back pains, which Dr. Nutik eventually determined were caused by aggravation of a degenerative condition. Mr. Fromenthal also stated on August 31, 1995, that he experienced pain in his right hip while walking. Those complaints were still present on September 19, 1995. Dr. Nutik eventually determined that the leg pain was probably caused by polyneuropathy, perhaps associated with Mr. Fromenthal's diabetes.
Dr. Carl Kitziger, an orthopedic surgeon, examined Mr. Fromenthal twice. The last time he saw Mr. Fromenthal was February 7, 1997, two and one-half years after the accident and injury. At that time, Mr. Fromenthal complained of constant pain, difficulty walking, some numbness in his feet (possibly related to his diabetic neuropathy), and chronic low back pain. Dr. Kitziger testified that the low back pain might be caused by the hip injury aggravating the pre-existing degenerative disc disease. Mr. Fromenthal had reached maximum medical improvement on February 7, 1997, Dr. Kitziger said.
Mr. Fromenthal stated that he has been unable to perform many activities he regularly performed around the house after the accident. He was unable to replace glass, cut grass, do plumbing or electrical work, or perform any other types of repairs around the house. One reason he cannot do a lot of those chores is his inability to climb a ladder. Because of his hip pain, he is unable to sleep, Mr. Fromenthal said. Because of his back pain, he is unable to drive, he said. Moreover, Mr. Fromenthal testified that his relationship with his wife has been a lot more strained since his injury because of his irritability.
Mrs. Fromenthal testified that her husband had always been a hard worker and that the family, which included five children, had always relied on him for support. Three of the Fromenthals' children and two grandchildren were living in their home at the time of the trial. Mrs. Fromenthal testified at length about the added burden of caring for Mr. Fromenthal during the first few months following his injury. She stated that a lot of things about their lives changed when her husband was injured. She confirmed Mr. Fromenthal's statements about the strained nature of their relationship, saying that things had been stressful for both of them and that Mr. Fromenthal is irritable and short-tempered with her and with their children and grandchildren. Moreover, Mrs. Fromenthal testified that she often sees her husband in pain. Mrs. Fromenthal stated that she and her husband depleted their savings, and that she was forced to return to work.
*14 Considering the above facts and circumstances, we award the Fromenthals $250,000 in general damages to compensate for Mr. Fromenthal's past, present, and future physical and mental pain and suffering.

B. Medical expenses
The parties stipulated that Mr. Fromenthal had incurred $28,680.53 in medical expenses related to his injury by the time of trial. Thus, he is hereby awarded that amount for past medical expenses.
Concerning future medical expenses, Dr. Kitziger recommended annual x-rays for three years, then semi-annual radiographs for ten years. We also recognize that Mr. Fromenthal will require medications to control his pain during the remaining years of his life. Thus, we award the Fromenthals $20,000 for future medical expenses.

C. Lost wages
Mr. Fromenthal suffered a heart attack in the summer of 1993, and underwent two bypass surgeries. At that time, he missed a couple of months of work; otherwise, he had worked all his adult life. Moreover, Steve Richoux, Mr. Fromenthal's supervisor at Eckstein Marine, testified that Mr. Fromenthal had returned to his pre-heart attack job prior to the injury at Delta Well.
Dr. Nutik testified that soon after the surgery, he was concerned that Mr. Fromenthal would never return to his pre-injury occupation as a diesel mechanic. Dr. Nutik ultimately determined that Mr. Fromenthal would be able to do only sedentary work in the future. Dr. Nutik stated in his deposition that Mr. Fromenthal had reached maximum medical improvement by February of 1996, and that he would never return to work as a diesel mechanic. Dr. Kitziger agreed that Mr. Fromenthal would never return to his pre-injury occupation, opining that he may be able to do sedentary or light-duty work.
Mr. Fromenthal stated at trial that he would be willing to go back to work anytime, if he could find a job. Moreover, he testified that he called every person on the lists given him by the vocational people. He also looked in the telephone book and want ads, and he called many other people seeking work and applying for jobs. However, he said, because of his injuries no one ever even called him for a job interview.
Mr. Fromenthal was evaluated by Robert Gisclair, a vocational rehabilitation counselor, who testified that Mr. Fromenthal was motivated to get back to work, and that he had cooperated on all the tests. Mr. Gisclair agreed with the medical experts that Mr. Fromenthal would never return to work as a diesel mechanic. Moreover, Mr. Gisclair stated that Mr. Fromenthal was not a good candidate for retraining because he had the following "vocational barriers": age, educational or functional level, and physical condition. Mr. Gisclair testified that Mr. Fromenthal's skill level was an asset; however, he said it would be difficult to transfer those skills. Also an asset was Mr. Fromenthal's employment access in the location where he lives. He described Mr. Fromenthal from a vocational point of view as follows: "an older individual who has less than a high school education who has some what I consider significant deficits." Moreover, he said the sedentary category to which Mr. Fromenthal is limited has the fewest amount of jobs of all categories, only 11 percent, and many of those jobs require higher educational skills than those possessed by Mr. Fromenthal.
Mr. Gisclair testified that the median national average of hourly wages for diesel mechanics is $13.30, for an average annual salary of $27,666. Wages actually run from a low of $12 per hour to a high of $17.50 per hour, he said. Thus, he said, Mr. Fromenthal could have conceivably earned as much as $35,000 per year in his work life. As a sedentary worker, Mr. Gisclair estimated that Mr. Fromenthal's *15 wages would be restricted to the $5 to $6 per hour range.
Dr. Ken Boudreaux testified as an expert in the field of forensic economics. He testified that Mr. Fromenthal was earning $518 per week at the time of the injury, and that his average salary for the years 1991 through 1994 was $24,000 to $26,000. On the basis of those figures, he estimated Mr. Fromenthal's lost wages between the accident and the trial as $63,408.66.
Concerning Mr. Fromenthal's future lost wages, Dr. Boudreaux testified that Mr. Fromenthal's work life expectancy was 6.1 years on the date of trial. In order to average $26,000 per year, Mr. Fromenthal would have to receive $142,407 to be invested in safe investments. In order to make allowances for raises, Mr. Fromenthal would have to receive between $137,000 and $148,000, depending on interest rates and rate of wage increase; that number includes no fringe benefits. Assuming that Mr. Fromenthal could earn minimum wages of $10,700 per year, Dr. Boudreaux estimated his future lost wages at $84,635. When he assumed that Mr. Fromenthal could have gotten a job on the "top end" for diesel mechanics, earning $35,000 per year, Dr. Boudreaux estimated his lost future wages at $190,4000, or $132,000 if he gets a job at minimum wage. Considering the above facts and circumstances, we award the Fromenthals $84,635 for Mr. Fromenthal's lost future wages, in addition to past lost wages of $63,408.66

V. CONCLUSION
Following our de novo review of the record in this case, we find that Delta Well is liable for Mr. Fromenthal's accident and injury. Moreover, we assign 50 percent comparative liability for the accident to Mr. Fromenthal. Finally, we award the following damages to the Fromenthals:

General Damages $ 250,000.00
Past Medical expenses 26,680.53
Future Medical expenses 20,000.00
Past Lost Wages 63,408.66
Future Lost Wages 84,635.00
 ------------
TOTAL $ 444,724.19

Accordingly, we enter judgment in favor of the Fromenthals and against Delta Well for 50 percent of the damages, or $ 222,362.09.
VACATED AND RENDERED.
BYRNES, J., DISSENTS WITH REASONS.
BYRNES, J., Dissenting with Reasons.
I respectfully dissent. The decision to admit or exclude the testimony of an expert witness is within the discretion of the trial judge. The decision to exclude the testimony of Commander Cole is reversible only for an abuse of that discretion. The record does not support a finding of such abuse. The substance of Commander Cole's profered testimony was simply that the ladder should have been secure according to OSHA regulations (incorporating A.N.S.I.standards). Commander Cole, who is also a lawyer, opined as to the applicability of OSHA standards to vessels. The applicability of OSHA regulations to vessels is a matter of law, a matter not to be determined by the testimony of Commander Cole. The OSHA regulations should speak for themselves. Regardless, the use of the ladder is a matter requiring no scientific or technical knowledge. The jurors' common sense and knowledge of the world is sufficient. Moreover the trial judge gave the following jury charge which conveyed in authoritative form all that would have been conveyed by the profered testimony of Commander Cole:
The American National Safety Institute Standard and the Code of Federal Regulations provide that the base section of a portable ladder must be placed with a secure footing. The Code of Federal Regulations also provides that in a ship requiring facility, ... portable ladders should be latched, blocked or otherwise secured to prevent their being displaced.
The decision of the majority to do a de novo review is based on "the cumulation of trial judge errors in evidentiary rulings, coupled with other improper circumstances *16 occurring at trial" citing Dixon v. Winn-Dixie Louisiana, Inc., 93-1627, p. 3 (La. App. 4 Cir. 5/17/94); 638 So.2d 306, 312. The "cumulation of trial judge errors in evidentiary rulings" relied on by the majority consists of only the exclusion of Commander Cole's testimony and the allowance by the trial court of references to plaintiffs workers' compensation claim, in violation of La. C.C. art 414.
As the exclusion of Commander Cole's testimony was not an abuse of the trial judge's discretion, there is no "cumulation" of reasons in support of the majority's decision to do a de novo review. There remains only the allowance of references to plaintiffs worker's compensation claim. And to the extent that the reference to plaintiffs worker's compensation claim was error, such error was rendered harmless by the curative jury instruction of the trial court.[1]Longman v. Allstate Ins. Co., 93-0352 (La.App. 4 Cir. 3/29/94); 635 So.2d 343
Therefore, a de novo review by this Court is not warranted.
As to damages, especially general damages, this Court should be particularly cautious in second guessing the great and vast discretion of the jury. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). I share the view of the majority that the jury award was low, and were this a Court of first instance or a de novo review I would be inclined to join with the majority on the question of damages. However, as this is not a Court of first instance and a de novo review is not called for, I cannot say that the jury decision on damages is without reasonable support in the record as a whole or that it is so low as to shock the conscience or offend right reason. Taylor v. Tulane Medical Center, 98-1967 (La.App. 4 Cir. 11/24/99); 751 So.2d 949, 965. As this Court declared recently in Comeaux v. C.F. Bean, 99-CA-0924, p. 11 (La.App. 4 Cir. 12/15/99); 750 So.2d 291, 298-299:
The awards are not obviously the result of passion or prejudice and they bear a reasonable relationship to the elements of the proved damages. Many rational triers of fact could have decided that a [higher] award is more appropriate, but [one] cannot conclude from the entirety of the evidence ... that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason."
Accordingly, I would affirm the judgment of the trial court.

ON APPLICATION FOR REHEARING
We grant rehearing for the limited purpose of addressing Mrs. Carol Jean Fromenthal's loss of consortium damages, interest, and costs.
The trial court originally granted Mrs. Fromenthal $12,000 for her loss of consortium damages resulting from Mr. Fromenthal's injuries. On appeal, we vacated the trial court judgment in its entirety and performed a de novo review. Although we addressed Mrs. Fromenthal's loss of consortium in our decision, we failed to make an award. Our original decision stated as follows:
Mrs. Fromenthal testified at length about the added burden of caring for Mr. Fromenthal during the first few months following his injury. She stated that a lot of things about their lives changed when her husband was injured. She confirmed Mr. Fromenthal's statements *17 about the strained nature of their relationship, saying that things had been stressful for both of them and that Mr. Fromenthal is irritable and short-tempered with her and with their children and grandchildren. Moreover, Mrs. Fromenthal testified that she often sees her husband in pain. Mrs. Fromenthal stated that she and her husband depleted their savings, and that she was forced to return to work.
We agree with the trial court that Mrs. Fromenthal is entitled to $12,000 in loss of consortium damages, to be reduced by Mr. Fromenthals comparative negligence to $6,000.
Moreover, the Fromenthals are entitled to judicial interest on the judgment from the date of judicial demand, as authorized by La. C.C.P. art 1921 and LSA-R.S. 13:1403. Finally, the costs of this appeal are to be split between the parties in the percentage of their liability, with the Fromenthals responsible for 50 percent of the costs and Delta Wells responsible for 50 percent.
REHEARING GRANTED; JUDGMENT AMENDED.
BYRNES, J., would deny rehearing.
NOTES
[1] The trail court gave the following jury instruction:

The law does not permit you to consider any payments to or on behalf of Mr. Fromenthal by any other source. Specifically if you decide to make an award of damages you are not to make any deductions from that amount for any workers compensation benefits that have been paid to or on behalf of Mr. Fromenthal. [Emphasis added.]